In re TELECTRONICS PACING SYS-
TEMS, INC., Accufix Atrial "J" Leads
Products Liability Litigation.

This Order relates to all cases.

No. 1–CV–95–087.
No. MDL–1057.

United States District Court,
S.D. Ohio,
Western Division.

Feb. 3, 1997.

Patrick Coffey, Gardner, Carton & Douglas, Chicago, IL, Gerald Rapien, Daniel Warncke, Taft, Stettinius & Hollister, Cincinnati, OH, for Defendants Pacific Dunlop Limited and Nucleus Limited.

Stanley Chesley, Terrence Goodman, Waite, Schneider, Bayless & Chesley, Cincinnati, OH, Richard Wayne, Matthew Kammerer, Strauss & Troy, Cincinnati, OH, David Bershad, Jerome Congress, Lori Feldman, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for Plaintiffs.

## ORDER DENYING MOTION TO DISMISS

SPIEGEL, Senior District Judge.

This matter is before the Court on Defendants Pacific Dunlop Limited and Nucleus Limited's Motion to Dismiss (doc. 42), Defendants' memorandum in support of the Motion to Dismiss (doc. 119), Plaintiffs' memorandum in opposition (doc. 148) and Defendants' reply (doc. 157).

### INTRODUCTION

This case involves a discussion of the limits of personal jurisdiction over out-of-state defendants who own corporations that do business in the forum. Pacific Dunlop Limited ("PDL") and Nucleus Limited ("Nucleus") (collectively the "Australian Defendants") are Australian corporations who have moved to dismiss this action against them for lack of personal jurisdiction. PDL is the beneficial owner, through Nucleus as the holding company, of TPLC, Inc., the manufacturer of an allegedly defective pacemaker. The Australian Defendants argue they are not subject to personal jurisdiction because they do not have sufficient contacts with any forum involved in this consolidated matter. The Australian Defendants further argue that they are only subject to jurisdiction if they are shown to be the alter ego of the Telectronics Companies.

In Part I, the Court will provide some background on this litigation and generally describe the facts pertinent to the question of personal jurisdiction. Part II delineates the general rule for the exercise of personal jurisdiction and Plaintiffs' arguments in favor of jurisdiction. In Part III, the Court evaluates whether this case presents a situation where it is appropriate to depart from the traditional forum based minimum contacts inquiry. The Court then determines in Part IV the proper test for personal jurisdiction in cases where jurisdiction is based upon a parent corporation's contacts with a subsidiary. Finally, in Part V, the Court analyzes whether the facts here satisfy the test of *International Shoe* as applied to the context of the parent-subsidiary relationship.

### I.

#### A. BACKGROUND

This is a products liability action concerning pacemakers containing the Accufix Atrial "J" Lead. A pacemaker is a device that uses electrical impulses to reproduce or regulate the rhythms of the heart. *Dorland's Illustrated Medical Dictionary*, (28th ed. 1994). It is driven by a battery and connected to the heart by leads and electrodes. *Id.*

The heart pacing system at issue here consists of three main parts: a pulse generator, leads, and a programmer. Each pacing system usually contains one or two leads, which traverse through a person's veins, di-

rectly from the pulse generator to inside the heart. The lead utilizes a retention wire to hold the atrial lead in the "J" shape. The lead's retention wire is a filament of one of two metal alloys, Elgiloy or MP35N. Telectronics Pacing Systems, Incorporated, Letter of Duane A. Schultz, Vice President Clinical and Regulatory Affairs, Premarket Notification to FDA, December 18, 1989. Both Elgiloy and MP35N are nickel-cobalt based alloys. *Id.*

The retention wire is not electrically active in the pacing circuit. Consequently, it has nothing to do with the conduction of the electrical signal or the operation of the pacing system. The retention wire is encased in polyurethane insulation and bends back and forth within the system.

Plaintiffs are recipients of pacemakers containing the "J" lead and their spouses. Plaintiffs claim that their pacemakers are defective because the retention wires will occasionally break because of the bending and poke through the polyurethane. Such a fracture can cause serious injury to the heart or blood vessels.

Plaintiffs, Elise and Eugene Owens, filed the lead action in this case on February 13, 1995, alleging injury due to a defective "J" lead. The Panel on Multi–District Litigation ("MDL Panel") selected this Court as the transferee court for all claims involving the Accufix "J" lead. Presently, over 400 cases are pending before this Court for pretrial proceedings. The Court appointed Plaintiffs' Steering Committee ("PSC") to coordinate discovery and other pretrial proceedings on behalf of Plaintiffs in the cases transferred to this Court. The Court ordered the PSC to file a Master Complaint. On July 20, 1995, Plaintiffs filed an Amended and Consolidated Master Class Action Complaint asserting claims for negligence, strict liability, failure to warn, breach of warranty, fraud, medical monitoring and emotional distress.

## B. JURISDICTIONAL FACTS

Defendant, TPLC, Inc., ("TPLC") is a Delaware Corporation engaged in the business of designing, manufacturing, and marketing medical devices including the Accufix atrial "J" lead pacemakers at issue in this case. Defendant, Telectronics Pacing Systems, Inc. ("TPSI"), is a corporation organized under the laws of the State of Delaware. TPSI owns 100% of the stock of TPLC. TPSI's sole business is to hold certain industrial property rights, real estate and the equity interest in TPLC.

Nucleus Limited ("Nucleus") is a corporation organized under the laws of Australia. It is a holding company involved in the medical products industry. Nucleus owns a group of companies that design, manufacture and sell pacemakers and defibrillators around the world under the trade name "Telectronics Pacing Systems" or "Telectronics" (collectively referred to as the "Telectronics Companies"). TPLC and TPSI are the two Telectronics Companies that operate in the United States.

Until 1988, Nucleus was a publicly-held Australian company. In 1988, Pacific Dunlop Limited ("PDL" or "Pacific Dunlop") purchased Nucleus and thus became beneficial owner of TPLC and TPSI.

Pacific Dunlop is organized under the laws of Victoria, Australia. It is in the business of manufacturing, marketing and distributing industrial and consumer products on a worldwide basis. PDL is organized into five core business areas (automotive, distribution, consumer products, building and construction and health care) consisting of over 225 separate corporate affiliates and subsidiaries with annual sales worldwide of approximately $5.5 billion.

Pacific Dunlop is a publicly held corporation. Its shares trade on the NASDAQ. It maintains bank accounts in the United States—New York. Pacific Dunlop also files reports with the Securities and Exchange Commission ("SEC") as the law requires of publicly traded companies. Four divisions of Pacific Dunlop conduct business in the United States, but none of which conducts business in Ohio. The four divisions have total sales in the United States of $1.1 million, none of which is in Ohio.

Nucleus, TPSI and TPLC are all subsidiaries in Pacific Dunlop's health care business. These three Defendants plus the other Telectronics Companies and other Nucleus' owned medical companies make up the "Nucleus Group" which is the medical products group of the Pacific Dunlop Family. The companies of the Nucleus Group are all separately incorporated but operate as part of a "functional organization."

Pacific Dunlop Holding Co. USA (PDH), a United States holding company which directly owns most of TPLC through TPSI, requires any subsidiary in which it owns 80% or more of the stock to file a consolidated United States income tax return. This allows for the offset of operating losses with operating profits of the various corporations. PDL's and Nucleus' performance results, however, are not included in this consolidated return.

The Telectronics Companies and other companies of the Nucleus Group "functionally cooperate" through an entity called the Nucleus Management Board ("NMB"). The NMB is an oversight committee made up of officers and directors of Nucleus and PDL. William Thomas, as Nucleus' Chief Executive Officer ("CEO"), designates the members of the NMB which includes Nucleus' Chief Financial Officer ("CFO"), PDL's managing director, and PDL's CFO. The NMB meets monthly and reviews the financial and management reports provided by TPLC's officers.

PDL is involved in establishing the budget for the companies of the Nucleus Group from the early stages of budget formulation through final approval. TPLC's annual budget is consolidated with the budgets of the other Telectronics Companies. Happ Aff. ¶ 21. This consolidated budget is submitted to Nucleus, which prepares a further consolidated budget for the Nucleus Group. The budget of the Nucleus Group is then transmitted to PDL for approval and reporting purposes. *Id.*

PDL and Nucleus are also involved in the approval of TPLC's capital expenditures.

TPLC must submit for approval any capital expenditure for more that $100,000 to Nucleus. All expenditures between $100,000 and $500,000 must be submitted to the Nucleus Management Board. The PDL's managing director reviews and approves capital expenditures greater than $500,000 but less than $2 million. The Board of Pacific Dunlop reviews and approves any capital expenditure over $2 million.

PDL provides financial services to its subsidiaries. The subsidiaries may borrow from or invest money with PDL (all at market rates) but are not required to do so. PDL is also involved in the risk management activities of its subsidiaries. PDL manages and coordinates risk by arranging for insurance coverage for itself and its subsidiaries.

Finally, PDL has on a few occasions agreed to indemnify TPLC suppliers. It claims to have done this only on two occasions when the supplier refused to do business with TPLC without the agreement from PDL. PDL felt this was the only way to protect its investment in TPLC by insuring that TPLC had supplies to carry on its business.

## II

### A. STANDARD OF REVIEW FOR PERSONAL JURISDICTION

A court may only exercise jurisdiction over an out-of-state defendant if the defendant is amenable to service of process under the forum's long-arm statute and if the exercise of jurisdiction over the defendant would not violate the Due Process Clause of the Fifth and Fourteenth Amendments. *Omni Capital Intern. v. Rudolf Wolff & Co. Ltd.*, 484 U.S. 97, 104, 108 S.Ct. 404, 409–10, 98 L.Ed.2d 415 (1987). There are two bases upon which the Court may exercise jurisdiction over a defendant in a diversity case under the Due Process Clause. First, there is general jurisdiction, which arises in cases in which a defendant's "continuous and systematic" contacts within the forum state renders that defendant amenable to suit in any lawsuit brought against it in the forum state.

*Nationwide Mutual Ins. Co. v. Tryg Intern. Ins. Co.,* 91 F.3d 790, 793 (6th Cir.1996) (citation omitted). Second is specific jurisdiction, which exists in cases in which the subject matter of the lawsuit arises out of or is related to the defendant's contacts with the forum. *Id.*

In a diversity action, the jurisdictional reach of a United States District Court is determined by the law of the state where the Court is located. *Pickens v. Hess,* 573 F.2d 380, 385 (6th Cir.1978). In the context of cases consolidated for pretrial purposes under 28 U.S.C. § 1407, the court can exercise personal jurisdiction to the same extent as the transferor court could. *In re Agent Orange Prod. Liability Litigation,* 818 F.2d 145, 163 (2d Cir.1987). Thus, if the transferor court in an individual case has jurisdiction over a defendant in the transferor court's forum, this Court also has jurisdiction in that action regardless of the defendant's contacts with this forum.

For a court to properly exercise personal jurisdiction over an out-of-state defendant, the court must first determine whether the exercise of personal jurisdiction is permitted under the long-arm statute of the forum state. *In–Flight Devices Corp. v. Van Dusen Air, Inc.,* 466 F.2d 220, 224 (6th Cir. 1972); *see also World-Wide Volkswagen Corp. v. Woodson,* 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980). If so, the court must then determine whether the extension of such jurisdiction violates notions of fair play provided for in the Due Process Clause of the Fourteenth Amendment. *International Shoe Co. v. State of Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945). In Ohio, the two inquiries are merged because the Ohio long-arm statute was "intended to extend the jurisdiction of its courts to the Constitutional limits." *In–Flight Devices,* 466 F.2d at 224.

In the context of specific jurisdiction, the Due Process Clause limits a court's exercise of personal jurisdiction to situations where the defendant has minimum contacts with the forum state which are substantial enough so as not to offend traditional notions of fair play and substantial justice. *R.L. Lipton Distributing v. Dribeck Importers, Inc.,* 811 F.2d 967, 969 (6th Cir.1987). The Sixth Circuit has developed a three-part test to determine if personal jurisdiction based upon specific jurisdiction is authorized by the Ohio long-arm statute and the Due Process Clause. *Southern Machine Co. v. Mohasco Industries, Inc.,* 401 F.2d 374, 380–81 (6th Cir.1968). First, the defendant must purposefully avail himself or herself of the privilege of acting in the forum state or of causing a consequence in the forum state. *Id.* at 380. Next, the cause of action must arise form the defendant's contact with the forum state. *Id.* at 381. Third, the defendant's activities or consequences must have substantial connection with the forum state so as to make the exercise of jurisdiction over defendant reasonable. *Id.*

The plaintiff has the burden of establishing by a preponderance of the evidence that the court has personal jurisdiction. *American Greetings Corp. v. Cohn,* 839 F.2d 1164, 1168 (6th Cir.1988). If the district court chooses to decide the issue based solely on the written materials, however, the plaintiff need only make a prima facie case of jurisdiction. *Id.* In other words, the plaintiff must only demonstrate facts which support a finding of jurisdiction in order to avoid a motion to dismiss. *Id.* at 1169.

## B. PLAINTIFFS' ARGUMENTS IN FAVOR OF JURISDICTION

Plaintiffs claim that this Court has jurisdiction over the Australian Defendants on a variety of grounds. First, Plaintiffs assert that New York can exercise general jurisdiction over the Australian Defendants. Plaintiffs insist that 28 U.S.C. § 1407 authorizes this Court to exercise jurisdiction in any action consolidated here as long as one transferor court had jurisdiction. Second, Plaintiffs argue that the Australian Defendants are subject to jurisdiction based upon their nationwide contacts with the United States. Third, Plaintiffs contend that the Australian Defendants are subject to jurisdiction because the Telectronics Companies are alter egos. Finally, Plaintiffs assert that jurisdiction is proper because the Telectronics Companies acted as agents for the Australian Defendants.

## III

### A. JURISDICTION BASED UPON CONSOLIDATION

#### 1. The Australian Defendants' Direct Contact with the Forums

■ PDL is a publicly held Corporation. Its shares trades on the NASDAQ. It maintains bank accounts in New York. Four division of Pacific Dunlop do business in the United States. The four divisions have total United States sales of $1.1 million, none of which is in Ohio. None of these divisions or sales has any relationship to the Accufix "J" lead pacemakers.

Thus, with the possible exception of New York, the Australian Defendants lack "continuous and systematic" contacts with any forum that would justify the exercise of general jurisdiction based upon their direct contacts. Furthermore, the Australian Defendants' direct contacts with the United States are clearly insufficient to create specific jurisdiction in any particular forum.

#### 2. Effect of Consolidation

■ The Court initially notes that consolidation of this matter for pretrial purposes under 28 U.S.C. § 1407 has no effect on the issue of personal jurisdiction. "A transfer under Section 1407 is, in essence, a change of venue for pretrial purposes." *In re FMC Corp. Patent Lit.*, 422 F.Supp. 1163, 1165 (J.P.M.L.1976). The MDL Panel may transfer cases without regard to whether the transferee court has personal jurisdiction over all parties. *Id.; see also In re Agent Orange Prod. Liability Lit.*, 818 F.2d 145, 163 (2d Cir.1987) (allowing exercise of personal jurisdiction by transferee court over members of class lacking minimum contacts with forum state of transferee court). Thus, "the transferee judge has all of the jurisdiction and powers over pretrial proceedings in the actions transferred to him that the transferor judge would have had in the absence of transfer." *In re FMC Corp. Patent Lit.*, 422 F.Supp. at 1165.

Plaintiffs argue that § 1407 allows the Court to exercise personal jurisdiction over the Australian Defendants in all of the cases if a transferor court had jurisdiction over

them in any individual case. No court has ever reached such a conclusion, and it is unlikely that Congress intended for § 1407 to expand personal jurisdiction in this way. *See Maricopa County v. American Petrofina, Inc.*, 322 F.Supp. 467, 469 (N.D.Cal.1971) ("I do not intimate that the jurisdiction of the court where the case is originally filed could be expanded by the use of the present multidistrict litigation statute."). Instead, this Court can only exercise jurisdiction over the Australian Defendants in individual cases where the transferor court could exercise jurisdiction over the Australian Defendants.

### B. NATIONWIDE CONTACTS

■ Although not stating so explicitly, Plaintiffs argue that the Australian Defendants should be subject to jurisdiction based upon their "nationwide contacts." Plaintiffs assert that the Australian Defendants have continuous and systematic involvement in the American economy as a whole which would justify the Court exercising jurisdiction. Rule 4(k)(2) of the Federal Rules of Civil Procedure authorizes the exercise of jurisdiction over an out-of-state defendant even if the defendant does not have sufficient minimum contacts with the forum state. Fed. R.Civ.Pro. 4(k)(2). This rule only applies in actions arising under federal law where Congress has specifically authorized such service. *Id.* It does not provide for jurisdiction based upon nationwide contacts in a case arising under state law. *See* Fed.R.Civ.Pro. 4(k) advisory committee's note ("This narrow extension of the federal reach applies only if a claim is made against the defendant under federal law. It does not establish personal jurisdiction if the only claims are those arising under state law or the law of another country.").

## VI

The genuine question presented by this motion is whether, and to what extent, the court can exercise jurisdiction over a nonresident corporation on the basis of the corporation's subsidiaries' contacts with the forum state. The Australian Defendants insist that in order for this Court to exercise juris-

diction over them, Plaintiffs must demonstrate that the Australian Defendants are alter egos (or pierce the corporate veil) of the Telectronics Companies. The Australian Defendants further contend that Plaintiffs have failed to provide sufficient facts to justify piercing the corporate veil. For the reasons stated below, we disagree and find that the proper inquiry is whether the Australian Defendants have sufficient "minimum contacts" with the forum state so as to find that the exercise of jurisdiction over them would not violate notions of fair play and substantial justice.

A fundamental rule of corporate law is that, normally, shareholders, officers and directors are not liable for the debts of the corporation. *Belvedere Condominium Unit Owners' Assoc. v. R.E. Roark Co.*, 67 Ohio St.3d 274, 287, 617 N.E.2d 1075 (1993) (discussing Ohio law). The alter ego doctrine was developed as an exception to this general rule in order to protect a corporation's creditors from shareholders who use the corporation's limited liability for fraudulent purposes. *Id.* Thus, the plaintiff can "pierce the corporate veil" by this doctrine and hold shareholders liable for the debts of the corporation "when it would be unjust to allow the shareholders to hide behind the fiction of the corporate entity." *Id.* Although the exact conditions which justify piercing the corporate veil vary somewhat from state to state, most courts examine whether the corporate form was used for fraudulent purposes. *In re Silicone Breast Implants Products Liability Lit.*, 837 F.Supp. 1128, 1133 (N.D.Ala.1993). The Australian Defendants insist that the Telectronics Companies are not alter egos PDL or Nucleus. They assert that their involvement with the Telectronics Companies is merely that which is required of any owner of a publicly traded corporation. While the companies of the Nucleus Group "functionally cooperate," PDL argues that does not mean they have disregarded the corporate form in order to justify piercing the corporate veil. PDL argues that all of the companies have separate boards and books. TPLC owns all of its own facilities, develops and manufactures its own products, hires its own employees and does not purchase materials from PDL or Nucleus. All

of the direct parents of TPLC have been in business for at least ten years. PDL further asserts that it has not changed the structure of the companies or replaced the existing officer and directors since the takeover. In addition, only one PDL officer has served on the Board of Directors of a Telectronics Company.

## A. DOES THE ALTER EGO DOCTRINE APPLY TO THE PERSONAL JURISDICTION ANALYSIS?

■ The formalistic approach of the alter ego doctrine, however, is irrelevant to the question whether the exercise of jurisdiction over an absent parent corporation would violate the Due Process Clause. *Energy Reserves Group, Inc. v. Superior Oil Co.*, 460 F.Supp. 483, 506 (D.Kan.1978).

> Concededly, a corporation's relationship with an affiliated corporation in the forum is relevant to the due process question in a manner different from that in which it pertains to the corporate law question of alter ego relationships and "veil piercing." For alter ego purposes the nature of the relationship—the identity between the corporations is alone controlling. For jurisdictional purposes, the fact of the existence of the relationship ... is a minimum "contact, tie or relation" with the forum that may render possible the constitutional exercise of jurisdiction if the relevant factors, including both convenience and the orderly administration of the laws, balance in that direction. The mere existence of the relationship is one relevant factor. The nature of the relationship the degree of control or identity bears upon the weight to be given that one factor, but it does not foreclose reliance on this factor as a legitimate consideration in the due process analysis.

*Id.* at 507; *see also Meredith v. Health Care Products, Inc.*, 777 F.Supp. 923, 926 (D.Wyo. 1991) ("Although the factors which indicate those circumstances under which a subsidiary corporation and its parent or owner may be treated as one for purposes of liability are significant in gleaning from the record whether the formal corporate separation has been maintained, these factors have little relation to those which bear upon the due

process fairness question of requiring a defendant to answer in the forum.").

Many courts, however, continue to conflate the requirements of due process and the alter ego doctrine. Much of confusion stems from questions regarding the continuing viability of the Supreme Court's opinion in *Cannon v. Cudahy Packing Co.*, 267 U.S. 333, 45 S.Ct. 250, 69 L.Ed. 634 (1925), which have addressed the issue whether a subsidiary's contacts with the forum can be imputed to the parent corporation. *See generally*, Lea Brilmayer & Kathleen Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies, and Agency,* 74 Cal.L.Rev. 1, 2–4 (1986) (discussing *Cannon* and its post-*International Shoe* significance). In *Cannon,* the plaintiff sued a Maine corporation for breach of contract in North Carolina. 267 U.S. at 334, 45 S.Ct. at 250. The plaintiff served the defendant through the process agent of its subsidiary, an Alabama corporation doing business in North Carolina. *Id.* The defendant moved to dismiss for lack of jurisdiction. The Supreme Court agreed that the defendant was not present in North Carolina for purposes of jurisdiction. While the Court recognized that "the defendant dominates the Alabama corporation immediately and completely," it concluded that because the corporations observed the corporate formalities the corporations were separate legal entities. *Id.* at 335–37, 45 S.Ct. at 250–52. Thus, the Court held that service was improper and upheld the motion to dismiss. *Id.*

While courts have continued to follow *Cannon* and assume that in order to impute the subsidiary's contacts to its corporate parent the plaintiff must pierce the corporate veil between the parent and the subsidiary, most do so without considering whether *Cannon*'s analysis is still valid. *See e.g., Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1160 (5th Cir.1983) ("Cannon, then, stands for the proposition that so long as a parent and subsidiary maintain separate and distinct corporate entities, the presence of one in a forum state may not be attributed to the other."); *Peterson v. U–Haul Co.*, 409 F.2d 1174, 1184 (8th Cir.1969) (citing *Cannon* and applying alter ego test for jurisdiction over parent); *DP Environmental Services Inc. v.*

*Bertlesen,* 834 F.Supp. 162, 165 (M.D.N.C. 1993) (same).

The Court of Appeals for the Sixth Circuit has explicitly found that formalistic application of the alter ego doctrine under *Cannon* was displaced by *International Shoe. Velandra v. Regie Nationale des Usines Renault,* 336 F.2d 292, 297 (6th Cir.1964). In *Velandra,* plaintiffs sued the French manufacturer and New York distributor of an automobile alleged to have caused the accident in which plaintiffs were injured. *Id.* at 293. Both the manufacturer and distributor moved to dismiss for lack of jurisdiction. *Id.* at 294. The Sixth Circuit rejected the conclusion in *Cannon* that the activities of a subsidiary did not subject a parent corporation to personal jurisdiction in local courts as no longer pertinent after *International Shoe. Id.* at 296–97.

> [T]he law relating to the fictions of agency and of separate corporate entity was developed for purposes other than determining amenability to personal jurisdiction, and the law of such amenability is merely confused by reference to these inapposite matters.

> The *International Shoe* decision represented an effort by the Supreme Court to clarify earlier concepts in the area of the amenability of foreign corporations to the personal jurisdiction of state courts by sweeping aside any lingering notions that the earlier shibboleths of 'consent,' 'presence,' and 'doing business' were self-defining abstractions, and by redefining those tests in terms of 'minimum contacts.' Following this decision it would seem appropriate, for the purpose of determining the amenability to jurisdiction of a foreign corporation which happens to own a subsidiary corporation carrying on local activities, to inquire whether the parent has the requisite minimum contacts with the State of the forum. Thus the ownership of the subsidiary carrying on local activities in Michigan represents merely one contact or factor to be considered in assessing the existence or non-existence of the requisite minimum contacts with the State of Michigan, but is not sufficient of itself to hold the present foreign corporations amenable to personal jurisdiction.

*Id.* at 297 (internal citation omitted). The court stressed that this minimum contacts test is "an analytical rather than a mechanical or formalistic" inquiry. *Id.* at 297 n. 21; *see also Third National Bank v. WEDGE Group,* 882 F.2d 1087, 1092–94 (6th Cir.1989) (Keith, J., concurring) (arguing that *Velandra* should apply to determine jurisdiction over parent based upon parent-subsidiary relationship and urging updating of *Velandra).*

A number of courts agree that *Cannon* is no longer applicable in the personal jurisdiction context and question whether it ever truly was applicable. *See e.g., Finance Co. of America v. BankAmerica Corp.,* 493 F.Supp. 895 (D.Md.1980) (noting that the Fourth Circuit had "abandoned, *sub silentio,* the formalistic inquiry required by *Cannon* in favor of a minimum contacts analysis."); *Coca–Cola Co. v. Proctor & Gamble Co.,* 595 F.Supp. 304, 307–08 (N.D.Ga.1983) (same); *Hoffman v. United Telecommunications, Inc.,* 575 F.Supp. 1463, 1470 (D.Kan.1983) (same); *Roorda v. Volkswagenwerk, A.G.,* 481 F.Supp. 868, 877–79 (D.S.C.1979) (same); *Energy Reserves Group,* 460 F.Supp. at 490–511 (same); *W. Clay Jackson Enterprises v. Greyhound Corp.,* 431 F.Supp. 1229, 1232 n. 1 (D.P.R.1977) (same); *Hitt v. Nissan Motor Co.,* 399 F.Supp. 838, 849 (S.D.Fla.1975) (same).

Several factors are helpful in illustrating why much of *Cannon* is inapplicable to the personal jurisdiction analysis. First, Justice Brandeis insisted that the issue in *Cannon* did not involve "questions of the constitutional powers of the State, or federal Government...." *Cannon,* 267 U.S. at 336, 45 S.Ct. at 251. Instead, courts and commentators have found that *Cannon* is "limited to an analysis of local service of process on a domestic subsidiary as a means of effecting service on an absent corporate parent." *Consolidated Engineering Co. v. Southern Steel Co.,* 88 F.R.D. 233, 238 (E.D.Va.1980); *see also* Brilmayer & Paisley, *supra,* at 3 ("Brandeis seemed to deny that any constitutional questions were presented and to suggest that the problem was that no state law or congressional act authorized jurisdiction.").

In *Cannon* the Supreme Court set forth the simple rule of law that service on a domestic subsidiary did not constitute service on an absent corporate parent where corporate formalities were observed. The rule in *Cannon* did not turn on constitutional considerations of due process, as in *International Shoe.* Rather, the rule was based on principles of corporate separateness. If the parent and subsidiary were separate and distinct in their corporate affairs, then in the absence of a contrary statutory rule, service on the latter did not render the former amenable to personal jurisdiction.

*Consolidated Engineering Co.,* 88 F.R.D. at 238. Thus, "[r]eliance on the rule in *Cannon* is unsound when extra territorial service is authorized by statute and when personal jurisdiction is predicated upon the due process standards of *International Shoe." Id.* at 237.

Second, and more importantly, even if *Cannon* purported to set a constitutional standard, that standard has undergone drastic changes since 1925. The question before the Court in *Cannon* was whether the "defendant was doing business within the State in such a manner and to such an extent to warrant the inference that it was *present* there." *Cannon,* 267 U.S. at 334, 45 S.Ct. at 250 (emphasis added). In *International Shoe v. Washington,* 326 U.S. 310, 66 S.Ct. 154, 90 L.Ed. 95 (1945), the Supreme Court replaced the "presence" test of *Pennoyer v. Neff,* 95 U.S. 714, 24 L.Ed. 565 (1877), with an inquiry into whether the defendant has such minimum contacts with the forum "to make it reasonable and just, according to our traditional conception of fair play and substantial justice" for the forum to exercise jurisdiction over the defendant. *Id.* at 320, 66 S.Ct. at 160.

The Supreme Court has not commented directly on the relevance of *Cannon* to the present due process analysis of personal jurisdiction. However, the Court has expressed support for the concept that jurisdiction over an absent corporation may be based upon on the activities of an agent. *See World–Wide Volkswagen v. Woodson,* 444 U.S. 286, 297, 100 S.Ct. 559, 567, 62 L.Ed.2d 490 (1980)

("[i]f the sale of a product of a manufacturer or distributor ... arises from the efforts of the manufacturer or distributor to serve, directly or *indirectly*, the market for its product in the other States, it is not unreasonable to subject it to suit in one of those States if its allegedly defective merchandise has there been the source of injury...."); *see also Finance Co. of America*, 493 F.Supp. at 906–07 (concluding that *Woodson* provides "implicit support" for the view that *International Shoe* changed the concept underlying *Cannon*); *Brunswick Corp. v. Suzuki Motor Co., Ltd.*, 575 F.Supp. 1412, 1419 (E.D.Wis.1983) (finding *Cannon* irrelevant because "[a]ll assertions of jurisdiction ... now must be evaluated according to the due process fundamental fairness standard of *International Shoe*").

Finally, some courts have acknowledged the inapplicability of *Cannon* by ignoring its strict alter ego approach and applying a less formalistic standard. *See Meredith v. Health Care Products, Inc.*, 777 F.Supp. 923, 926 (D.Wyo.1991) ("Because the jurisdictional question requires the balancing of many factors, the formal separation of corporate entities does not alone raise a bar to the court exercising jurisdiction."); *Echeverry v. Kellogg Switchboard & Supply Co.*, 175 F.2d 900, 902–03 (2d Cir.1949) ("In this field, realism, not formalism, should be dominant; the problem must be solved in the light of commercial actuality, not in the aura of juristic semantics."); *Superior Coal Co. v. Ruhrkohle*, 83 F.R.D. 414, 421 (E.D.Pa.1979) ("The substance, not form, of the inter-corporate nexus will be dispositive.").

We find persuasive the view that *International Shoe* has supplanted *Cannon* in the context of personal jurisdiction. *Cannon's*

presumption of form over substance is out-of-step with the modern approach to personal jurisdiction which is based upon fairness and reasonableness. Accordingly, we conclude that the formalistic alter ego principles of *Cannon* are no longer applicable in the analysis of whether the exercise of personal jurisdiction over a foreign corporation is constitutional.[1] Instead, the proper exercise of jurisdiction depends on a "sufficient connection between the defendant and the forum as to make it fair to require defense of the action in the forum." *Energy Reserves*, 460 F.Supp. at 502 (quoting *Kulko v. Superior Court*, 436 U.S. 84, 91, 98 S.Ct. 1690, 1696, 56 L.Ed.2d 132 (1978)).

### B. DUE PROCESS STANDARD

■ Our next task is to determine what level of interaction between the parent corporation and its in-forum subsidiary is sufficient to find that jurisdiction over the parent comports with traditional notions of fair play and substantial justice. Judge Keith in his concurring opinion in *WEDGE Group* suggested that in order for the court to properly exercise jurisdiction the plaintiff must show either "(1) *attribution*, 'that the absent parent instigated the subsidiary's local activity;' or (2) *merger*, 'that the absent parent and the subsidiary are in fact a single legal entity.'" *WEDGE Group*, 882 F.2d at 1094 (emphasis in original) (quoting Brilmayer & Paisley, *supra*, at 12).

Other courts have applied concepts similar to attribution and merger in order to determine if the subsidiary's contacts should be imputed to the parent corporation. *See e.g., Superior Coal Co.*, 83 F.R.D. at 421–22.[2] In *Superior Coal Co.*, the court applied doc-

---

1. At first glance, this conclusion may seem to conflict with previous decisions of this Court. *See e.g., Priess v. Fisherfolk*, 535 F.Supp. 1271 (S.D.Ohio 1982) (Spiegel, J.). In *Priess*, the Court did pierce the corporate veil in order to exercise jurisdiction over a non-resident defendant. The Court, however, also found jurisdiction over several other defendants was appropriate based upon a "single functional entity" theory and an agency theory. Thus, the Court's decision here is more a clarification rather than a reversal of our decision in *Priess*.

2. New York courts also apply an analogous two theory analysis for purposes of long-arm jurisdiction over out-of-state corporations which mirrors the inquiry suggested by Judge Keith. "The parent may be subject to jurisdiction where the subsidiary 'performs all the business' which the parent could do 'were it here by its own officials.' Additionally where the subsidiary is 'in fact, if not in name a branch of the parent, the distinction between the two fall and the parent is amenable to New York jurisdiction.'" *DCA Food Industries, Inc. v. Hawthorn Mellody, Inc.*, 470 F.Supp. 574, 583 n. 4 (S.D.N.Y.1979) (internal citations omitted).

trines analogous to merger and attribution. Under the merger category, the court identified factors that indicated a sufficiently substantial relationship to justify the court's jurisdiction such as ownership, control and integrated management. *Id.* at 421. Under a test comparable to attribution, Judge Troutman suggested that courts examine whether the subsidiary performs duties and functions such as marketing and distribution which the principal would normally transact through its own agents or departments. *Id.*

The attribution test implies that the in-forum subsidiary is acting on behalf of the absent parent. Thus, the Court attributes the subsidiary's contacts to the parent because the parent "purposefully avails" itself of doing business in the forum by accessing the market through a subsidiary. *See Brunswick Corp.*, 575 F.Supp. at 1422–23 (finding that parent corporation availed itself of benefits and protections of forum by selling products indirectly through wholly-owned subsidiary). The clearest example of this theory occurs when a foreign manufacturer uses a subsidiary to distribute its products in the forum. *See e.g., Voorhees v. Cilcorp, Inc.*, 837 F.Supp. 395, 402 (M.D.Fla.1993) (stating jurisdiction may be proper if subsidiary is distributor, wholesaler or broker through which foreign parent sells its products in forum). Another way to view the attribution theory of jurisdiction is to look to see if the "parent uses the subsidiary to do what it otherwise would have done itself." *Gallagher v. Mazda Motor of America, Inc.*, 781 F.Supp. 1079, 1085 (E.D.Pa.1992).

Under the merger theory of jurisdiction, the two entities are so closely aligned that it reasonable for the parent to anticipate being "haled" into court in the forum because of its relationship with its subsidiary. Some factors that might indicate a sufficient relationship with the subsidiary to justify jurisdiction include overlap in board of directors and officers, interchange of personnel between the parent and the corporation, exchange of documents and records between parent and subsidiary, listing subsidiary as a branch, agent or division of the parent, or indicating that subsidiary and parent are part of the same entity, sending technical personnel to subsidiary by parent at its own expense to assist the subsidiary with its operations. *Hitt*, 399 F.Supp. at 850 (citations omitted).

The line between these two theories is not always clear. *See Bulova Watch Co. v. K Hattori & Co.*, 508 F.Supp. 1322, 1334 (E.D.N.Y.1981) (noting that the line boundary between New York's similar two-theory test for "doing business" for purposes of long-arm service). The two proposed theories are merely shorthand devices for defining what constitutes traditional notions of fair play and substantial justice for purposes of the due process analysis of *International Shoe* based upon the parent-subsidiary relationship. "The 'minimum contacts test' of *International Shoe* precludes mechanical application of facts and circumstances and requires instead the determination of reasonableness or fairness." *Hoffman*, 575 F.Supp. at 1470. As Judge Weinstein stated, the court must make "a common sense appraisal of economic relationships ... [and] examine a business relationship from the practical viewpoint of businessmen rather than through the distorting lens of a legal conceptual framework established in an earlier era." *Bulova Watch Co.*, 508 F.Supp. at 1327. Thus, some courts have applied a balancing test to determine whether foreign defendant's contacts through a subsidiary are sufficient to satisfy due process. *Hoffman*, 575 F.Supp. at 1470.

In *Hoffman*, besides analyzing whether the corporate formalities existed, the court looked to the nature of the relationship between the corporations, (*i.e.*, the degree of control exercised or identity shared), the amount of revenue the non-resident derives from the affiliated corporation in the forum, whether the claim arose in the jurisdiction, the inconvenience to the defendant of the forum, and concerns of fair and orderly administration of justice. 575 F.Supp. at 1471–73.

Other factors which help determine whether the defendants contacts are substantial and therefore justify jurisdiction as reasonable include: (1) the quantity of the contacts; (2) the nature and quality of the contacts; (3) the source of the contacts and their connection with the cause of action; (4) the inter-

ests of the forum; and (5) the convenience of the parties. *Brunswick*, 575 F.Supp. at 1417 (quoting *Nagel v. Crain Cutter Co.*, 50 Wis.2d 638, 648, 184 N.W.2d 876 (1971)).

## V

Accordingly, in this case, we will analyze the relationship between the Australian Defendants and the Telectronics Companies to determine whether it indicates an inference of either attribution or merger. We perform this analysis keeping in mind that the facts often do not fit in neat "cubbyholes" and that our true inquiry is into the reasonableness of the exercise of jurisdiction. *Bulova Watch Co.*, 508 F.Supp. at 1322.

The relationship between the Australian Defendants and the Telectronics Companies displays the characteristics of the merger theory of jurisdiction rather than attribution. The Australian Defendants purchased the Telectronics Companies as operating companies. The Telectronics Companies design, manufacture and distribute their own product, rather than perform a service for the parent corporation. Thus, the Australian Defendants did not "instigate" the Telectronics Companies' actions in the forum, nor did the Telectronics Companies perform duties which Nucleus and PDL would have performed themselves in the forum. *See id.* at 1342 (noting that lack of these factors indicated parent doing business through subsidiary).

On the other hand, the Australian Defendants exercised a great deal of control over the Telectronics Companies. The NMB, the managing director of PDL, or the PDL Board approved all large capital expenditures by the Telectronics Companies. The NMB meet monthly to review monthly reports on the Telectronics Companies and provide strategic planning and advice. Mr. Thomas, CEO of the Telectronics Companies and Nucleus, was an employee of PDL and PDL paid his salary. As for day-to-day oversight, he reported to Philip Brass the managing Director of PDL rather than the Board of Nucleus or the Telectronics Companies. *See Consolidated Engineering Co.*, 88 F.R.D. at 239–40 (finding as an element of undue control of subsidiary by parent for jurisdictionally purposes when subsidiary's management level employees were supervised parent corporation's management). A committee of Nucleus and PDL officers oversaw the operations and approved actions of the Telectronics Companies. Thus, the association between the Telectronics Companies and the Australian Defendants is deep and wide-ranging and evidences "undue control" of the Telectronics Companies by the Australian Defendants. *See Coca-Cola v. Proctor & Gamble Co.*, 595 F.Supp. 304, 308 (N.D.Ga. 1983) (finding exercise of jurisdiction satisfied due process when parent exercised pervasive control through interlocking directorates, commonality of officers, and necessity of review and approval of subsidiary actions). Mr. Thomas does not even recall attending or participating in a Board meeting for TPSI or TPLC. Thomas, Depo. 115–16.

PDL maintained a bank in New York which served as a sort of treasury for the companies of the Nucleus Group. This account acted as a central depository for the cash of the companies of the Nucleus Group. In addition, the Nucleus Group Companies could borrow money at will from PDL's account as long as the money was within budget parameters. Livingstone, Depo. at 246–48. Apparently, any money owing to or owed by the individual companies was "reallocated" into a capital contribution or reduction in capital at the end of the fiscal year. *Id.* at 262–63.

Furthermore, there is evidence that PDL officials maintained that the Telectronics Companies and their products were part of PDL in statements to outsiders. Philip Brass, managing director of PDL, corresponded with officials from the Food and Drug Administration ("FDA") concerning the Accufix "J" lead problem. Pl.Ex. 2, Letter of March 20, 1995. Nucleus officials portrayed the Telectronics Companies as the "Medical Division of Pacific Dunlop Ltd" in a letter to potential American investors. Pl.Ex. 4, Letter of August 15, 1990.

In addition, on two occasions, PDL signed indemnification agreements with TPLC's suppliers. PDL took this action to ensure that TPLC could continue to operate. This action also demonstrates that PDL is willing,

when it so desires, to accept responsibility for the obligations of its subsidiaries.

Finally, the Court finds PDL's involvement in the Accufix "J" Lead controversy to be especially telling as to the intimate affiliation between the parent and subsidiary. Mr. Brass went to Washington, D.C. to meet with FDA officials to discuss the "J" Leads. He even referred to TPLC as "we" when discussing the "J" Lead recall and patient management program. Essentially, the Telectronics Companies' problems became problems for Nucleus and PDL as well.

The Court finds that these facts create an inference "that the absent parent and the subsidiary are in fact a single legal entity," at least for the purposes of exercising jurisdiction. PDL and Nucleus officials participated in the day-to-day operations of the Telectronics Companies. Collectively, Defendants often treated these institutions as one entity for internal and external purposes. Thus, the Court concludes that Plaintiffs have made a *prima facie* case that the Defendants should be merged for purposes of the due process inquiry under *International Shoe*.

Furthermore, we conclude then that a number of factors tip the balance in favor of the conclusion that the exercise of jurisdiction over the Australian Defendants is reasonable in this situation.

First, as just indicated, the Australian Defendants exercise a great deal of control over the Telectronics Companies. Second, the Australian Defendants have extensive investment in subsidiaries in the United States and receive substantial revenues from the American market. PDL generated over $1.5 billion in sales in the Americas in 1994, a substantial portion of which was obviously in the United States. Pl. ex. 3 at 49. PDL companies operate numerous subsidiaries with over sixty facilities in the United States. Pl. ex 3 at 28.

Third, officers of the Australian Defendants occasionally treated the Telectronics Companies as a part of PDL's larger organization. *See Hitt*, 399 F.Supp. at 850 (finding jurisdiction proper without piercing corporate veil where among other factors parent treated subsidiary as "as a part of an integral world-wide operation"). Fourth, it is unlikely that PDL and Nucleus will endure a substantial hardship by having to defend this matter in the American forums. PDL is a large multinational corporation with extensive holdings in the United States. Officers of both Australian Defendants make regular visits to the United States in order to oversee and direct their investments here.

Fifth, the Court presumes that the forum states have a substantial interest in the individual cases by providing their citizens a convenient forum to redress their injuries. In order to make this presumption, the Court assumes that most Plaintiffs filed their individual action in their home state. Finally, PDL's involvement in the "J" Lead matter certainly indicates PDL's intimate relationship to the issues raised in this case. It therefore does not seem unreasonable to require them participate in the litigation concerning the "J" Leads.

In closing, the Court would like to point out that it has addressed this motion in a general manner for all cases. Consequently, our analysis is based upon the due process limits to personal jurisdiction. Some states, however, do not authorize the exercise of jurisdiction to the limits of the Due Process Clause. Furthermore, our conclusion that the exercise of personal jurisdiction over the Australian Defendants does not violate Due Process assumes an interest by the forum state to resolve this matter—generally derived from the forum's interest in granting its citizens a forum in which to obtain relief. Accordingly, if Defendants believe that either consideration is an issue in an individual action they must bring those specific instances to the Court's attention.

### CONCLUSION

Accordingly, the Court DENIES Pacific Dunlop Limited's and Nucleus Limited's Motion to Dismiss.

SO ORDERED.