**METRO–GOLDWYN–MAYER STUDIOS INC., et al., Plaintiffs,**

v.

**GROKSTER, LTD., et al., Defendants.**

**Jerry Leiber, et al., Plaintiffs,**

v.

**Consumer Empowerment Bv A/K/A Fasttrack, et al., Defendants.**

**Nos. CIV.01–08541 SVW, CIV.01–09923 SVW.**

United States District Court, C.D. California.

Jan. 9, 2003.

the property to the cause of the loss." CA Civ.Code § 2195 (1985).

11. Docket number 20.

ORDER DENYING DEFENDANT SHARMAN NETWORKS LTD.'S AND DEFENDANT LEF INTER-ACTIVE'S MOTIONS TO DISMISS

WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs bring these actions for copyright infringement under 17 U.S.C. §§ 501, et seq. The Court has jurisdiction pursuant to 28 U.S.C. § 1331. Defendant Sharman Networks Ltd. moves to dismiss for lack of personal jurisdiction, lack of subject matter jurisdiction, improper venue, and forum non conveniens. *See* Fed. Rules Civ. P. Rules 12(b)(1), (2), and (3). Defendant LEF Interactive Pty Ltd. moves to dismiss for lack of personal jurisdiction only.

For the reasons set forth below, both Motions are DENIED.

## II. FACTUAL/PROCEDURAL BACK-GROUND

### A. *The Parties*

These two related cases arise from the free exchange of copyrighted music, movies and other digital media over the Internet. When the actions were originally filed, Defendants Grokster, Ltd. ("Grokster"), Streamcast Networks, Inc. (formerly known as MusicCity.com, Inc.) ("Streamcast" or "MusicCity"), and Kazaa BV (formerly known as Consumer Empowerment BV) ("Kazaa BV"), distributed software that enabled users to exchange digital media via the same peer-to-peer transfer network. In the *Metro–Goldwyn–Mayer. v. Grokster* case, CV–01–8541, Plaintiffs are organizations in the motion picture and music recording industries, and bring an action against Defendants for copyright infringement, pursuant to 17 U.S.C. §§ 501, et seq. In the *Lieber v. Consumer Empowerment* case, CV–01–9923, Plaintiffs are professional songwriters and music publishers bringing a class action for essentially the same claims against the same Defendants. The cases have been consolidated for discovery and pretrial purposes.

When the actions were originally filed, Grokster, MusicCity and Kazaa BV each independently branded, marketed and distributed file-sharing software. All three platforms were powered, however, by the same "FastTrack" networking technology. This technology was developed by Defendants Niklas Zennström and Janus Friis (who also launched Kazaa BV), and licensed to each company. As a result, users of all three software platforms were connected to the same peer-to-peer "Fast-Track network," and were able to exchange files seamlessly.[1]

Kazaa BV, which is a Netherlands corporation, did not contest jurisdiction in either case. Rather, it answered and counterclaimed for declaratory relief. In January 2002, while related legal action was pending against it in the Netherlands, Kazaa BV transferred ownership of key assets to the newly-formed Sharman Networks, Ltd. ("Sharman").[2] Sharman is a company organized under the laws of the island-nation of Vanuatu and doing business principally in Australia. The assets transferred to Sharman include the Kazaa.com website and domain, and the Kazaa Media Desktop ("KMD") software. In its agreement to acquire these assets, Sharman explicitly disclaimed assumption of any of Kazaa BV's liabilities, including any liability arising from these lawsuits. (Memo of P & A in Support of Sharman's Motion to Dismiss for Lack of Subject Matter Jurisdiction and Other Grounds ("Sharman Mot."), Declaration of Nicola Hemming, ¶ 6.)

---

**1.** This state of affairs has changed somewhat since the cases were filed. First, as discussed *infra*, the operation of the "Kazaa system" has passed from Kazaa BV to Sharman Networks, Ltd. Second, the Streamcast/MusicCity Defendant no longer uses the FastTrack technology. Rather, Streamcast now employs the "open" (i.e., not proprietary) Gnutella networking technology, and distributes its own software instead of a branded version of the Kazaa Media Desktop, which it previously used. As a result, users of Streamcast's product, Morpheus, no longer connect to the Fast-Track network and do not exchange files with Grokster or Kazaa users. Instead, they connect to the Gnutella network and are able to exchange files with users of any number of Gnutella clients.

**2.** Sharman is owned by Australian business-person Nicola Hemming. However, Kazaa BV principal Niklas Zennström apparently helped bankroll Sharman by lending some up-front money used to purchase Kazaa BV's assets. Sharman then repaid the loan out of revenue subsequently derived from these assets. (Decl. of Ana C. Reyes in Support of Opposition to Defendants' Motions, Hemming Dep., at 168–173.)

The FastTrack software is owned by a company known as Joltid, Ltd. ("Joltid" (formerly "Blastoise")), which is owned by Zennström. Shortly after Sharman's acquisition of the Kazaa assets, Joltid granted an "irrevocable, perpetual, worldwide license" to Sharman for the use and sublicensing of FastTrack. (Sharman's Reply Memorandum in Support of Motion to Dismiss ("Reply"), Declaration of Nicola Hemming Concerning Blastoise Agreement, Exh. A, at 1.) In return, Joltid receives twenty percent of Sharman's revenue. (*Id.;* Decl. of Ana C. Reyes in Support of Opposition to Defendants' Motion, Hemming Dep. at 152.) In essence, Sharman has acquired Kazaa BV's primary assets—the Kazaa brand, domain and website, the KMD software, and a long-term license to the FastTrack software—without having formally acquired the company. Meanwhile, Kazaa BV has apparently ceased defending this action.

### B. *The Kazaa System*

Although novel in important respects, the "Kazaa system" operates in a manner conceptually analogous to the Napster system described at length by the district court in *A & M Records, Inc. v. Napster, Inc.,* 114 F.Supp.2d 896 (N.D.Cal.2000).

In summary, Sharman provides free proprietary software, the Kazaa Media Desktop, that enables Internet users to search for and exchange digital media with other users of file-sharing software powered by the FastTrack technology. Sharman also operates the Kazaa.com website, which serves as a central distribution and customer support hub for the KMD software.

The KMD software can be transferred to the user's computer, or "downloaded," from servers operated by Sharman (for instance, by visiting Sharman's Kazaa.com website, or third-party CNET's Download .com, and choosing to download the software). Once installed, each KMD user may elect to "share" certain files located on the user's computer, including, for instance, music files, video files, software applications, e-books, and text files. When launched on a user's computer, KMD automatically connects to the FastTrack peer-to-peer network, and makes any shared files available for transfer to any other user's computer.

Once connected to the FastTrack network, the KMD software provides a range of means through which a user may search through this pool of shared files. For instance, a user can select to search only among audio files, and then enter a keyword title or artist search. Once a search commences, the KMD software displays a list (or partial list) of users who are currently sharing files that match the search criteria, including data such as the estimated time required to transfer each file. The user may then click on a specific listing to initiate a direct transfer from the source computer to the requesting user's computer. When the transfer is complete, the requesting user and source user have identical copies of the file, and the requesting user may also start sharing the file with others. The KMD software includes other features, such as facilities for organizing, viewing and playing media files, and for communicating with other users.

Because the KMD software itself is free, most of Sharman's revenue comes through its advertising partnerships. Instead of selling advertising directly, Sharman "bundles" its KMD software with third-party software that operates whenever KMD is launched. The third-party software retrieves advertising from third-party servers not controlled by Sharman, and then displays that advertising through the KMD interface.

## III. SHARMAN'S MOTION TO DISMISS

### A. *Personal Jurisdiction*

■ For this Court to have personal jurisdiction over the Defendants, the exercise of jurisdiction must be authorized under California's "long-arm" jurisdictional statute and comport with constitutional due process limitations. *Aanestad v. Beech Aircraft Corp.,* 521 F.2d 1298, 1300 (9th Cir.1974); *see* Fed.R.Civ.P. 4(k)(1)(A). Because California authorizes jurisdiction to the full extent of the Constitution, the only question before the Court is whether the exercise of in personam jurisdiction in this case is consistent with due process. *See* Cal.Code Civ. Proc. § 410.10 (2002); *Peterson v. Highland Music, Inc.,* 140 F.3d 1313, 1317 n. 2 (9th Cir.1998).

■ Plaintiff has the burden of establishing that jurisdiction exists over the Defendants. *Cubbage v. Merchent,* 744 F.2d 665, 667 (9th Cir.1984), *cert. denied,* 470 U.S. 1005, 105 S.Ct. 1359, 84 L.Ed.2d 380 (1985). However, the plaintiff need only make a prima facie showing of jurisdiction to survive a jurisdictional challenge on a motion to dismiss where, as here, a court has not heard testimony or made findings of fact.[3] *Ziegler v. Indian River County,* 64 F.3d 470, 473 (9th Cir.1995); *Omeluk v. Langsten Slip & Batbyggeri A/S,* 52 F.3d 267, 268 (9th Cir.1995); *Data Disc, Inc. v. Systems Tech. Assoc., Inc.,* 557 F.2d 1280, 1285 (9th Cir.1977). For purposes of a motion to dismiss, factual allegations are taken as true, though it is appropriate when considering jurisdictional issues to look beyond the pleadings to any evidence before the Court. *Cargill Intern. S.A. v. M/T Pavel Dybenko,* 991 F.2d 1012, 1019 (2d Cir.1993).

■ In the absence of a traditional basis for asserting jurisdiction (i.e., physical presence, domicile or consent), due process requires that a non-resident defendant have "certain minimum contacts with the forum [state] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *International Shoe Co. v. State of Washington,* 326 U.S. 310, 316, 66 S.Ct. 154, 90 L.Ed. 95 (1945) (quoting *Milliken v. Meyer,* 311 U.S. 457, 463, 61 S.Ct. 339, 85 L.Ed. 278 (1940)). The defendant is subject to "specific jurisdiction" where the cause of action arises out of or relates to the defendant's contacts with the forum. *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472 n. 15, 105 S.Ct. 2174, 85 L.Ed.2d

---

**3.** Defendant LEF Interactive PTY, Ltd. ("LEF") argues that because Plaintiffs have taken extensive discovery on the jurisdictional issue, they should be held to a "preponderance of the evidence" burden. (LEF's Reply to Pls.' Opp. to Mot. to Dismiss, at 3.) LEF cites one Second Circuit case and one District of Columbia case that seem to support this proposition. (*Id.*)

However, this Court is not governed by those decisions. Rather, the controlling authority in this circuit is that set forth in *Data Disc* and reaffirmed in *Omeluk* and *Ziegler.* The *Data Disc* court established that where jurisdiction is determined by written materials, such as "affidavits or affidavits plus discovery materials," a plaintiff must make only a prima facie case of jurisdiction. 557 F.2d at 1285. Where these materials raise issues of credibility or disputed questions of fact, the district court in its discretion may order a preliminary hearing to resolve the contested issues. *Id.* Only "[i]n this situation, where the plaintiff is put to his full proof," is plaintiff required to "establish the jurisdictional facts by a preponderance of the evidence ..." *Id.* Plaintiffs in this case have been limited to written submissions; the Court has not conducted a hearing or made findings of fact. Thus, Plaintiffs are obligated under *Data Disc* to make only a prima facie showing. Moreover, the Court notes that most of the key jurisdictional facts are essentially undisputed. As set forth *infra,* they present a compelling case for jurisdiction over both Sharman and LEF, effectively mooting the question of which burden applies.

528 (1985). If the defendant's contacts are of a sufficient magnitude, it is subject to "general jurisdiction"—that is, subject to suit on any matter, including those not arising out of the in-forum activity. *See Perkins v. Benguet Consol. Mining Co.,* 342 U.S. 437, 447–48, 72 S.Ct. 413, 96 L.Ed. 485 (1952).

### 1) *In–Forum Activities*

Plaintiffs assert that Sharman engages in a wide range of contacts with this forum, which can be summarized roughly as follows:

1) Provision of the KMD software to approximately two million California residents and execution of end-user license agreements between Sharman and these users;

2) Use of California and U.S. agents, including a Los Angeles-based public relations firm, a California company engaged in selling and serving advertising to users of the KMD software, and a San Francisco-based law firm;

3) Contracts Sharman assumed from Kazaa BV, including use of California-based CNET.com for recording the number of copies of Defendant's software downloaded, and advertising-related agreements with California and U.S. companies; and,

4) Inclusion in certain contracts assumed from Kazaa BV of California and other U.S. state choice of law and forum selection clauses, including in the FastTrack licensing agreement.

(Plaintiffs' Memorandum in Opposition to Defendants Sharman's and LEF's Motions to Dismiss ("Opp.") at 4–10.)

### 2) *General Jurisdiction*

Plaintiffs do not make a serious case for general jurisdiction, instead consigning their argument on this point to a two-sentence footnote. (*See* Opp. at 12 n. 8.) Indeed, it appears that while Sharman has engaged in a continuous stream of contacts with the forum, they are not the types of contacts that generally approximate physical presence. They are therefore insufficient to establish general jurisdiction.

■ General jurisdiction over a non-resident defendant exists where the defendant's contacts are "continuous and systematic," and the exercise of jurisdiction satisfies "traditional notions of fair play and substantial justice." *Ziegler,* 64 F.3d at 473. The standard for establishing general jurisdiction is "fairly high," *Brand v. Menlove Dodge,* 796 F.2d 1070, 1073 (9th Cir.1986), and requires that defendant's contacts be of the sort that "approximate physical presence." *Bancroft & Masters, Inc. v. Augusta Nat'l, Inc.,* 223 F.3d 1082, 1086 (9th Cir.2000) (citing *Gates Lear jet Corp. v. Jensen,* 743 F.2d 1325, 1331 (9th Cir.1984)). The Supreme Court has upheld general jurisdiction only once, in a case involving wide-ranging contacts,[4] and the Ninth Circuit regularly has declined to find jurisdiction even in the presence of extensive contacts. *Amoco Egypt Oil Co. v. Leonis Navigation Co.,* 1 F.3d 848, 851 n. 3 (9th Cir.1993), *citing Perkins,* 342 U.S. 437, 72 S.Ct. 413, 96 L.Ed. 485.

■ Factors to be taken into consideration in this analysis include whether the defendant is incorporated or licensed to do business in the forum state, has offices, property, employees or bank accounts there, pays taxes, advertises or solicits

---

4. During Japanese occupation of the Philippines, a Philippine company conducted most of its business affairs from the president's home and office in Ohio, including board meetings, correspondence, banking and payment of salaries. *Perkins,* 342 U.S. at 447–48, 72 S.Ct. 413.

business, or makes sales in the state. *See Hirsch v. Blue Cross, Blue Shield of Kansas City,* 800 F.2d 1474, 1478 (9th Cir. 1986); *Bancroft & Masters,* 223 F.3d at 1086; *Amoco Egypt Oil Co.,* 1 F.3d at 851 n. 3.

 As discussed *infra,* Sharman certainly engages in a continuous stream of commercial contact with the forum state, including provision of its software and execution of licensing agreements with a large number of California residents. It also engages in more limited commercial contact with advertising vendors, a website for counting downloads of its software, and in-state legal and public relations representatives. However, Sharman is not registered or licensed to do business in California, nor does it appear to have any substantial presence here (e.g., offices, employees or assets). Commercial contact absent other indicia of corporate presence is typically not sufficient to establish general jurisdiction. *See Helicopteros Nacionales de Colombia, S.A. v. Hall,* 466 U.S. 408, 104 S.Ct. 1868, 80 L.Ed.2d 404 (1984) (no general jurisdiction where Colombian corporation repeatedly purchased helicopter parts in Texas and sent employees there for training, but did not have offices, agents, employees or a license to do business there). In short, it is impossible based upon the contacts alleged in this case to conclude that Sharman "may in fact be said already to be 'present' " in California. *Wells Fargo & Co. v. Wells Fargo Express Co.,* 556 F.2d 406, 413 (9th Cir.1977).

Thus, general jurisdiction is not available in this case, and the Court must look to whether specific jurisdiction is appropriate.

### 3) *Specific Jurisdiction*

 "The Due Process Clause protects an individual's liberty interest in not being subject to the binding judgment of a forum with which he has established no meaningful 'contacts, ties, or relations.' " *Burger King,* 471 U.S. at 471–72, 105 S.Ct. 2174 (quoting *International Shoe Co. v. Washington,* 326 U.S. at 319, 66 S.Ct. 154). Despite the somewhat nebulous nature of this inquiry, courts typically apply rather mechanical tests, which necessarily have arisen from long experience in this area. These tests are instructive, however, and not necessarily definitive. *See Ochoa v. J.B. Martin & Sons Farms,* 287 F.3d 1182, 1189 n. 2 (9th Cir.2002). Rather, the central due process inquiry remains whether an exercise of jurisdiction is "consistent with traditional notions of fair play and substantial justice." *Quill Corp. v. North Dakota,* 504 U.S. 298, 307, 112 S.Ct. 1904, 119 L.Ed.2d 91 (1992) (quoting *International Shoe,* 326 U.S. at 316, 66 S.Ct. 154) (internal citation omitted)).

 Under prevailing Ninth Circuit doctrine, specific jurisdiction is presumptively reasonable where: 1) a nonresident defendant purposefully avails itself of the privilege of conducting activities in the forum state, thereby invoking the protections of its laws; and 2) the plaintiff's claims arise out of the defendants' forum-related activities. *See Ochoa v. J.B. Martin & Sons Farms,* 287 F.3d at 1189 & n. 2; *Ziegler,* 64 F.3d at 473.

### a) *Purposeful Availment and Relatedness*

 The purposeful availment prong requires that defendant purposefully direct its activities toward the forum, or purposefully avail itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of local law. *See, e.g., Data Disc,* 557 F.2d at 1287–88 (commercial act or transaction with forum); *Bancroft & Masters,* 223 F.3d at 1087 (effect of tortious act felt in forum).

### 1) *Unrelated Contacts*

Before considering whether Sharman's contacts constitute "purposeful availment," it is important to note that several seem immediately to fail the second prong of the specific jurisdiction analysis: relatedness.

▓ Contacts with a forum state are relevant for purposes of specific jurisdiction only if they are sufficiently related to the cause of action. The Ninth Circuit adopts a broad, "but for" test of relatedness. *See Loral Terracom v. Valley National Bank,* 49 F.3d 555, 561 (9th Cir. 1995) (second prong of jurisdictional analysis is met if, but for the contacts between the defendant and the forum state, the cause of action would not have arisen); *Carnival Cruise Lines, Inc. v. Shute,* 499 U.S. 585, 589, 111 S.Ct. 1522, 113 L.Ed.2d 622 (1991) (declining to consider the Ninth Circuit's "but for" test, and reversing on other grounds). Thus, if Plaintiffs' claims would have arisen notwithstanding certain contacts, those contacts are not relevant to the jurisdictional analysis. *See Ballard v. Savage,* 65 F.3d 1495, 1500 (9th Cir.1995).

To justify the relatedness of many of the contacts above, Plaintiffs offer variations of their rather conclusory argument that all the contacts are "necessary to every single aspect of [Defendants'] infringing business...." (Opp. at 18.) In other words, but for Sharman's overall corporate activities, it would not be in business and would not be engaging in the alleged infringement of Plaintiffs' copyrights. Plaintiffs argue that contacts such as corporate contracts, the retention of law and public relations firms, and advertising-related sales, all go toward perpetuating Sharman's business, and thus enabling the infringement of which Plaintiffs complain. (*See* Opp. at 14–18.)

▓ It is true that the Ninth Circuit's "but for" test of relatedness is broader than those adopted by certain other circuits. *See Nowak v. Tak How Invs.,* 94 F.3d 708, 714–15 (1st Cir.1996) (comparing tests). Nonetheless, "but for contacts" still must have some degree of proximate causation to be considered for purposes of jurisdiction. *See, e.g., Doe v. American Nat'l Red Cross,* 112 F.3d 1048, 1051–52 (9th Cir.1997) (alleged negligence of FDA official in regulating blood supply too attenuated from actual injury to be considered but for cause of death resulting from transfusion of tainted blood).

Plaintiffs' implicit theory of relatedness would swallow the rule, at least with respect to corporate defendants. All corporate contacts are, in some sense, intended to further corporate purposes. But no court has held that this fact dispenses with the relatedness analysis. Rather, contacts may only be considered for purposes of the jurisdictional analysis if they are sufficiently related to the underlying causes of action. *See Bancroft & Masters,* 223 F.3d at 1088 (pertinent contacts are those "that give rise to the current suit"); *Marino v. Hyatt Corp.,* 793 F.2d 427, 430 (1st Cir. 1986) (proximate causation test); *Sybaritic, Inc. v. Interport Int'l, Inc.,* 957 F.2d 522, 524–25 (8th Cir.1992) (same); *Third Nat'l Bank in Nashville v. WEDGE Group, Inc.,* 882 F.2d 1087, 1091 (6th Cir. 1989) ("substantial connection" test); *In re Oil Spill by Amoco Cadiz off Coast of France,* 699 F.2d 909, 917 (7th Cir.1983) (similar).

Contacts with U.S. agents such as public relations representatives and lawyers, contacts respecting advertising relationships, and the use of a California company for counting downloads of Sharman's software, are simply not but for causes of the alleged infringement. Further, the fact that Sharman may have executed or assumed contracts containing California forum selection or choice of law provisions is immaterial on this point with respect to contracts that are essentially unrelated to

Plaintiffs' claims. (*See* Opp. at 9–10 n. 6 & 7.) The only contract with such provisions that is even peripherally related to these cases is a license for use of the FastTrack peer-to-peer technology that powers the KMD software. Such a license is simply too attenuated from the infringement itself to be considered a significant contact in the jurisdictional analysis.

Plaintiff does allege that Sharman engages in "geo-targeted" advertising, i.e., advertising that is targeted to California residents. In at least one outlier case, advertising that gave rise to a plaintiff's claims was held to be sufficiently related to those claims. *See Nowak*, 94 F.3d at 715 (Hong Kong hotel's solicitation of business in Massachusetts sufficient to justify jurisdiction in Massachusetts over claims related to Massachusetts resident's drowning death in hotel's pool). Here, however, the advertising seen by users is served by third-party companies, which pay Sharman to bundle their advertising software with Sharman's KMD. Thus, any targeting of forum residents is done by other companies and not by Sharman. More significantly, there is no evidence that this advertising gave rise to Plaintiffs' claims, i.e., that the advertising itself is a relevant contact for purposes of jurisdiction over the copyright claims.

### 2) *Related Contacts*

In contrast, Sharman's distribution of the KMD software, and licensing of its use, are "but for" causes of the alleged infringement. But for Sharman's acts in these regards, Plaintiffs' claims of direct infringement never would have arisen against Sharman.[5]

Defendant's chief argument against purposeful availment is that its "internet activities" are "passive in nature," and that, while the KMD software can be downloaded by anyone in the world, Sharman "does not purposefully direct anything toward California." (Mot. at 18.) Rather, Sharman asserts that it "does not know the identity" of persons downloading its software nor does it know where they reside. (Reply at 12.) In short, Sharman contends, the KMD software is made freely available worldwide, and the only distribution contacts with California are those initiated by California residents.

Indeed, the Supreme Court has held that personal jurisdiction cannot be exercised constitutionally where the only contact with the forum state is the result of an isolated or fortuitous act not directed by the defendant. *See World–Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 100 S.Ct. 559, 62 L.Ed.2d 490 (1980) (no Oklahoma jurisdiction over New York automobile dealer in products liability action where the only contact with the forum was the sale of the car to New York residents who subsequently drove the vehicle to Oklahoma and suffered injuries there); *Kulko v. Superior Court*, 436 U.S. 84, 98 S.Ct. 1690, 56 L.Ed.2d 132 (1978) (consent by father, who is a New York resident, to allow children to live with mother who had relocated to California not sufficient to establish jurisdiction over father in California for enforcement of child support obligations); *Hanson v. Denckla*, 357 U.S. 235, 78 S.Ct. 1228, 2 L.Ed.2d 1283 (1958) (no jurisdiction in Florida over Delaware corporate trustee where trust was executed in Delaware and plaintiff then relocated to Florida).

---

**5.** Technically, Sharman's distribution of its software to California residents is a but for cause of only a portion of the injuries alleged: those resulting from use of the software by California residents. To the extent that this distinction would deprive California state courts of jurisdiction over certain aspects of these cases, this Court nonetheless may consider Sharman's other U.S. contacts under Rule 4(k)(2) of the Federal Rules of Civil Procedure. *See infra*.

▮ Consequently, this Court previously has recognized that the operation of a "strictly 'passive' website, in which the only contacts with the forum state consist[ ] of mere viewings of the website's content by those surfing the internet," typically will not give rise to specific jurisdiction. *Batzel v. Smith,* 2001 WL 1893843, at *2 (C.D. Cal. June 6, 2001). On the other hand, jurisdiction may be appropriate where the Internet conduct includes "something more" to show the plaintiff directed substantial activity toward the forum. *Cybersell, Inc. v. Cybersell, Inc.,* 130 F.3d 414, 418 (9th Cir.1997). These poles reflect a familiar spectrum, wherein jurisdiction is more likely the greater the " 'level of interactivity and commercial nature of the exchange of information that occurs' " with the forum state. *Id.* at 418 (quoting *Zippo Mfg. Co. v. Zippo Dot Com,* 952 F.Supp. 1119, 1124 (W.D.Pa.1997)).

▮ In this analysis, the Court considers the scope and nature of the related contacts. Factors include whether the defendant encouraged residents of the forum state to engage in relevant contacts with the defendant, whether there is evidence that the contacts constitute a continuous and substantial part of the defendant's business, whether the defendant exchanged messages with forum residents or gained subscribers through its contacts, or whether the defendant otherwise purposefully availed itself of the privilege of doing business in the forum. *Cybersell, Inc.,* 130 F.3d at 419; *see CompuServe, Inc. v. Patterson,* 89 F.3d 1257 (6th Cir.1996) (finding jurisdiction where defendant entered into contract to distribute shareware via server located in forum state).

Here, there is little question that Sharman has knowingly and purposefully availed itself of the privilege of doing business in California. First, Sharman essentially does not dispute that a significant number of its users—perhaps as many as two million—are California residents.[6] Indeed, given that Sharman's KMD software has been downloaded more than 143 million times,[7] it would be mere cavil to deny that Sharman engages in a significant amount of contact with California residents.

Second, Sharman does not dispute that the distribution of its software is an essentially commercial act. While the KMD software is freely available, it is distributed for the singular purpose of facilitating advertising and otherwise generating income for Sharman. Moreover, Sharman enters into a licensing agreement with every user authorizing and limiting use of the software. While Sharman may not ask each user where he or she is located, and may therefore not know exactly how many agreements it has entered into with California residents, Sharman is at least constructively aware that many such agreements are executed daily.[8]

6. Plaintiffs claim that the Kazaa software has been downloaded by at least 20 million U.S. users. (*See* Reyes Decl., Exh. 34.) Plaintiffs base this estimate on a May 28, 2002 statement by a representative of one of Sharman's third-party advertising vendors, which is admissible pursuant to Rule 801(d)(2) of the Federal Rules of Evidence. Because California accounts for twelve percent of the U.S. population, Plaintiffs reasonably conclude that at least two million California residents have downloaded the software. (Opp. at 5.) Defendant responds primarily by arguing that "[n]o figures of this kind have ever been developed or documented by Sharman." (Reply at 11.) Notably, Sharman does not argue that Plaintiffs' figure is somehow inaccurate.

7. CNET's Download.com, the website Sharman uses to track the number of times its software is downloaded, recently reported 143,056,276 total downloads. (*See* Reyes Decl., Exh. 74.)

8. Sharman argues that these agreements are nothing more than "passive notification" to

In sum, Sharman engages in a significant quantum of commercial contact with California residents constituting a but for cause of Plaintiffs' claims. Jurisdiction is therefore presumptively reasonable.

### 3) Alternative Basis for Purposeful Availment: Effects Test

Even if purposeful availment were not manifested by Sharman's commercial contacts, it nonetheless may be demonstrated through the "effects test." Because the Court has already concluded that Plaintiffs have established a prima facie case of purposeful availment, however, the following merely articulates a partial alternative basis for its conclusion.

### 1. Legal Standards

■ Even where a defendant does not directly contact the forum state, purposeful availment may be demonstrated where the effects of a defendant's conduct are felt in the forum state. *Calder v. Jones*, 465 U.S. 783, 104 S.Ct. 1482, 79 L.Ed.2d 804 (1984) (establishing the "effects test" for personal jurisdiction); *Panavision Int'l L.P. v. Toeppen*, 141 F.3d 1316, 1321–22 (9th Cir.1998) (sustaining jurisdiction over a non-resident defendant who registered Internet domain names that infringed plaintiff's trademarks). Under the *Calder* line of cases, personal jurisdiction is appropriate where a non-resident defendant engages in "(1) intentional actions (2) expressly aimed at the forum state (3) causing harm, the brunt of which is suf-

fered—and which the defendant knows is likely to be suffered—in the forum state." *Panavision*, 141 F.3d at 1321 (quoting *Core-Vent Corp. v. Nobel Industries AB*, 11 F.3d 1482, 1486 (9th Cir.1993)).

Sharman does not dispute that jurisdiction typically is appropriate where a foreign defendant engages in significant infringement of a resident's intellectual property, and knows where the harm from that infringement is likely to be suffered. (*See* Sharman Reply at 6–7.) *See Panavision, supra; Indianapolis Colts, Inc. v. Metropolitan Baltimore Football Club*, 34 F.3d 410 (7th Cir.1994) (upholding Indiana jurisdiction in trademark infringement action by National Football League's Indianapolis Colts against Canadian Football League's Baltimore CFL Colts).

Rather, Defendant argues that the effects test, as applied by *Calder* and its progeny, has not been used to establish jurisdiction against someone "*other than* the actual wrongdoer directly causing the harm . . . ." (Sharman Reply at 7.) According to Sharman, the effects test requires an intent to cause a "tortious effect" within the forum state. (Sharman Reply at 8.) Sharman concludes that because the primary claims in this case arise from direct infringement by its users, and not by Sharman itself, the effects test does not apply. (*Id.* at 9.)

Although there is some merit to these contentions, Sharman does not adequately

---

potential customers of the terms of the software's use, and that such "clickwrap" agreements do not support personal jurisdiction. (Reply at 11.) Sharman's citation to *Westcode, Inc. v. RBE Elecs. Inc*, 2000 WL 124566 (E.D.Pa. Feb. 1, 2000), for this contention actually undermines its argument. The agreement at issue in *Westcode* was an acknowledgment of the terms and condition for use of defendant's website. *Id.*, at *6. However, the website "simply [sought] to provide information to interested parties." *Id.* Because the website was a passive, information-

al site, an agreement regulating its use bore "no relationship to the sale of goods." *Id.*, at *6 n. 2. Here, the KMD software is designed as a commercial product, and the agreement is designed to authorize and facilitate an essentially commercial relationship between Sharman and its users. Moreover, the *Westcode* court noted the absence of any evidence that a significant number of forum residents accessed the site. *Id.*, at *6. Here, there is evidence that perhaps two million forum residents have downloaded and use Sharman's product.

distinguish between Plaintiffs' theories of liability. The effects test is likely sufficient to show purposeful availment for purposes of the contributory infringement claims, while it might not be able to support an exercise of jurisdiction over the vicarious infringement claims.

### 2. Contributory Infringement

 Contributory infringement originated in tort and "stems from the notion that one who *directly contributes* to another's infringement should be held accountable." *Fonovisa, Inc. v. Cherry Auction, Inc.*, 76 F.3d 259, 264 (9th Cir.1996) (emphasis added). Thus, the traditional statement of the doctrine, adopted in this circuit, is that "[o]ne who, with knowledge of the infringing activity, induces, causes or materially contributes to the infringing conduct of another, may be held liable as a 'contributory' infringer." *Gershwin Publishing Corp. v. Columbia Artists Management, Inc.*, 443 F.2d 1159, 1162 (2d Cir. 1971), *cited in Fonovisa, Inc.*, 76 F.3d at 264. In other words, "liability exists if the defendant engages in personal conduct that encourages or assists the infringement." *A & M Records v. Napster, Inc.*, 239 F.3d 1004, 1019 (9th Cir.2001) ("*Napster*") (internal quotations omitted). At the risk of turning the test into a tautology, contributory infringement will lie only where the defendant *contributed* to the infringement, i.e., knowingly and intentionally assisted, induced or caused the infringement.

Therefore, to prevail on their contributory infringement claim, Plaintiffs will have to show that Sharman *intended to contrib-*ute to the infringing conduct of another. Under *Napster,* 239 F.3d at 1020–21, it would be insufficient for Plaintiffs in this case to allege simply that Defendants' peer-to-peer file sharing software may be used to infringe Plaintiffs' copyrights.

Indeed, Plaintiffs allege that Defendants have infringed Plaintiffs copyrights through "willful, intentional and purposeful" conduct. (*See MGM v. Grokster* FAC ¶ 64). To this effect, Plaintiffs complain that Defendants: 1) actively participated in the unauthorized distribution and reproduction of copyrighted works, and 2) provided the means and facilities for, and encouraged users to engage in, unauthorized reproduction and distribution of copyrighted works. (*See MGM v. Grokster* FAC ¶¶ 58–59, 62.)

 However, the effects test is not satisfied simply by showing that the tortious act was intentional. Rather, the intentional conduct "must be targeted at a plaintiff whom the defendant knows to be a resident of the forum state." *Bancroft & Masters,* 223 F.3d at 1087. Plaintiffs allege, and Sharman does not dispute, that Sharman was and is aware that much of the alleged copyright infringement affects Defendants. (Opp. at 5, 13–14) (Sharman was aware of this litigation when it acquired Kazaa BV's assets, and Plaintiffs have sent notices of millions of separate infringements committed by Kazaa users to both Kazaa BV and Sharman). Moreover, Sharman is and has been well aware of the charge that its users are infringing copyrights, and reasonably should be aware that many, if not most, music and video copyrights are owned by California-based companies.[9] (*See* Reyes Decl., Exh.

---

**9.** Sharman argues that the California Supreme Court decision in *Pavlovich v. Superior Court,* 29 Cal.4th 262, 127 Cal.Rptr.2d 329, 58 P.3d 2 (2002), which was recently stayed by the U.S. Supreme Court pending further briefing, is persuasive in its holding that awareness of possible injury to California-based industries does not satisfy the knowl-edge prong of the effects test. In *Pavlovich,* a sharply divided California Supreme Court reversed an appeals court decision upholding jurisdiction in California over defendant Pavlovich, a Texas resident. Pavlovich's sole contact with California consisted of posting on the Internet the source code for a DVD encryption system licensed by the plaintiff, an

5, Deposition of Jeffrey Rose, at 135–136, 138–139.) *See Panavision*, 141 F.3d at 1321 (effects test satisfied because defendant likely knew that plaintiff would suffer harm in California, since "its principal place of business was in California, and the heart of the theatrical motion picture and television industry is located there.").

Thus, Plaintiffs have alleged that Sharman intentionally and materially contributed to the infringement of Plaintiffs' works, and that it did so with full knowledge that much of the harm from this infringement would be suffered in California.[10] This is sufficient to establish a prima facie case of purposeful availment under the effects test of *Panavision*.[11]

entertainment trade association based in California. *Id.*, 29 Cal.4th at 265, 58 P.3d 2, 127 Cal.Rptr.2d at 332. The system was intended principally to prohibit unauthorized reproduction of copyrighted motion pictures distributed on DVD. *Id.*

The trade association argued in part that jurisdiction was proper because Pavlovich knew the posting would harm not only the licensor trade association, but also "the motion picture, computer and consumer electronics industries centered in California." *Id.*, 127 Cal.Rptr.2d at 340, 29 Cal.4th at 275, 58 P.3d at 11. A bare four-judge majority found that this did not satisfy the "effects test" for purposeful availment. *Id.*, 29 Cal.4th at 269, 127 Cal.Rptr.2d at 340, 58 P.3d at 6.

However, the majority highlighted key facts that led to their conclusion, and that distinguish the *Pavlovich* case from the instant actions. First, the court questioned whether the argument was relevant at all, since the trade association did not assert a claim for illegal pirating of copyrighted works. *Id.*, 29 Cal.4th at 297, 58 P.3d at 25, 127 Cal.Rptr.2d at 357. Thus, any eventual injury to the entertainment industry from such pirating was largely speculative, particularly considering that licensing of the encryption standard to entertainment companies did not begin until two months *after* Pavlovich posted the source code. *Id.*, 29 Cal.4th at 293, 297, 58 P.3d at 22, 25, 127 Cal.Rptr.2d at 354, 357. Second, the court emphasized that "there is no evidence that any California resident ever visited, much less downloaded the [source code]" from Pavlovich's website. *Id.*, 29 Cal.4th at 291, 58 P.3d at 21, 127 Cal.Rptr.2d at 353.

Consequently, the majority conceded the narrowness of its holding, and observed that "[a] defendant's knowledge that his tortious conduct may harm industries centered in California is *undoubtedly relevant* to any determination of personal jurisdiction and *may support* a finding of jurisdiction." *Id.*, 29 Cal.4th at 278, 58 P.3d at 13, 127 Cal.Rptr.2d at 342

(emphases added). Indeed, the majority held only "that this knowledge *alone* is insufficient to establish express aiming at the forum state as required by the effects test." *Id.*, 29 Cal.4th at 278, 58 P.3d at 13, 127 Cal.Rptr.2d at 342 (emphasis original).

In this case, there is evidence of continuous and substantial contact with forum residents in addition to the alleged injuries. Sharman is also aware of this and similar litigation, and has received from Defendants myriad notices of alleged infringement. Accordingly, knowledge of likely injury to the entertainment industry is only one facet of Sharman's general knowledge that its alleged conduct was and is likely to injure California residents. Thus, even if this Court were governed by *Pavlovich* (which it is not), it is apparent that the potential injury to California-based industries would be an important "effects test" factor, whether or not it is dispositive.

10. Defendant's contention that "none of the harm complained of was intended by the nonresident defendant Sharman," (Sharman Reply at 9), goes to the merits of the action, not to whether Plaintiffs have made a prima facie case of jurisdiction.

11. Several courts have exercised jurisdiction in analogous contexts. *See, e.g., Alto Prods. Corp v. Ratek Indus.*, 1996 WL 497027 (S.D.N.Y. Sept. 3, 1996) (jurisdiction in Lanham Act case where foreign defendant had no contact with forum state other than in-state sales through a distributor with knowledge the distributor was selling in the forum) (citing *Levi Strauss & Co. v. Textiles Y Confecciones Europeas, S.A.*, 222 U.S.P.Q. (BNA) 971 (S.D.N.Y.1983) (jurisdiction in contributory trademark infringement claim in similar circumstances)); *Blue Ribbon Pet Prods., Inc. v. Rolf C. Hagen (USA) Corp.*, 66 F.Supp.2d 454, 460 (E.D.N.Y.1999) ("Canada's out-of-state acts contributed to or induced Hagen USA's infringement ... within New York and

### 3. *Vicarious Liability*

 Sharman's argument appears to have more merit as applied to the vicarious liability claims. As the *Napster* court noted, vicarious liability "is an 'outgrowth' of respondeat superior." 239 F.3d at 1022 (citing *Fonovisa*, 76 F.3d at 262). Though claims for vicarious copyright infringement extend beyond the employer/employee context, they are limited to those cases where the defendant "has the right and ability to supervise the infringing activity and also has a direct financial interest in such activities." *Id.* (quoting *Gershwin*, 443 F.2d at 1162).

 Notably, however, neither an intent to infringe nor knowledge of direct infringement is an element of this tort. *See Napster*, 239 F.3d at 1022–24 (failure to police system combined with financial interest in ongoing infringement sufficient to justify preliminary injunction); *Shapiro Bernstein and Co. v. H.L. Green Co.*, 316 F.2d 304 (2d Cir.1963) (imposing vicarious liability on owner of department store chain for infringing sales by independent concessionaire, despite fact that owner was unaware of the infringement).

Thus, it is somewhat doubtful that the alleged acts comprising vicarious liability are sufficient to satisfy the intentional act and express aiming requirements of the effects test under *Panavision*. *See also Bancroft & Masters*, 223 F.3d at 1087. Nonetheless, because the Court has concluded that purposeful availment is otherwise demonstrated in these cases, it is unnecessary to conclude that the effects test alone demonstrates purposeful availment for all claims.

### b) *Reasonableness*

 Even where sufficient minimum contacts are demonstrated, an exercise of personal jurisdiction is constitutional only if "reasonable." [12] *Burger King*, 471 U.S. at 476–78, 105 S.Ct. 2174; *Insurance Co. of North America v. Marina Salina Cruz*, 649 F.2d 1266, 1270 (9th Cir. 1981). Conversely, considerations of reasonableness may justify jurisdiction upon a lesser showing of contacts than is customarily required. *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174; *Ochoa v. J.B. Martin & Sons Farms*, 287 F.3d 1182, 1189 n. 2 (9th Cir.2002).

 Thus, notwithstanding the analysis above, the due process inquiry "cannot be simply mechanical or quantitative," nor can it be resolved by determining whether a defendant's conduct is "a little more or a little less" than some theoretical threshold. *International Shoe*, 326 U.S. at 319, 66 S.Ct. 154. Rather, "[t]he essence of the issue here, at the constitutional level, is . . . one of general fairness to the corporation." *Perkins*, 342 U.S. at 445, 72 S.Ct. 413.

 This fairness consists principally of ensuring that jurisdiction over a person is not exercised absent "fair warning that a particular activity may subject [that] person to the jurisdiction of a foreign sovereign." *Shaffer v. Heitner*, 433 U.S. 186, 218, 97 S.Ct. 2569, 53 L.Ed.2d 683 (1977) (Stevens, J., concurring in the judgment), *quoted in Burger King*, 471 U.S. at 472, 105 S.Ct. 2174. In other words, the Due Process Clause gives "a degree of predictability to the legal system that allows potential defendants to structure their

are sufficient to subject it to personal jurisdiction in New York").

**12.** An otherwise valid exercise of jurisdiction is presumed to be reasonable, however, and the burden is upon the defendant to "present a compelling case" that it is not. *Ballard v. Savage*, 65 F.3d 1495, 1500 (9th Cir.1995) (quoting *Burger King*, 471 U.S. at 477, 105 S.Ct. 2174).

primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *World–Wide Volkswagen*, 444 U.S. at 297, 100 S.Ct. 559.

■ Accordingly, the touchstone constitutional inquiry is whether the defendant's "conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *Id., quoted in Calder v. Jones*, 465 U.S. at 790, 104 S.Ct. 1482, *and Kulko v. Superior Court*, 436 U.S. at 97–98, 98 S.Ct. 1690; *see also Gordy v. Daily News, L.P.*, 95 F.3d 829, 832 (9th Cir.1996) (this inquiry is the "touchstone" of due process); *Lake v. Lake*, 817 F.2d 1416, 1421 (9th Cir.1987) ("fundamental determination"); *Sher v. Johnson*, 911 F.2d 1357, 1361 (9th Cir.1990).

■ Plaintiffs clearly have carried their burden in this respect. Sharman provides its KMD software to millions of users every week, and executes a licensing agreement with each user permitting use of the software. Sharman has not denied and cannot deny that a substantial number of its users are California residents, and thus that it is, at a minimum, constructively aware of continuous and substantial commercial interaction with residents of this forum. Further, Sharman is well aware that California is the heart of the entertainment industry, and that the brunt of the injuries described in these cases is likely to be felt here. It is hard to imagine on these bases alone that Sharman would not reasonably anticipate being haled into court in California.

However, jurisdiction is reasonable for an important added reason: Sharman's effective predecessor, Kazaa BV, was engaged · in this very litigation when Sharman was formed. Sharman was apparently created for the sole purpose of acquiring Kazaa BV's key assets and taking over operation of the Kazaa system. Sharman assumably was aware when it formed that Kazaa BV had not contested jurisdiction in this litigation, but rather had answered and counter-claimed in both cases. Had Sharman actually acquired and merged with Kazaa BV, there is little question that Sharman would be held to answer in this Court in place of Kazaa BV. Because Sharman has succeeded Kazaa BV in virtually every aspect of its business, Sharman reasonably should have anticipated being required to succeed Kazaa BV in this litigation as well. If Sharman wished to "structure [its] primary conduct with some minimum assurance" that it would not be haled into court in this forum, it simply could have avoided taking over the business of a company already enmeshed in litigation here.

■ Nor has Sharman made a "compelling case" that jurisdiction would be unreasonable on the basis of any of the other factors considered with respect to reasonableness: 1) the extent of the defendant's purposeful interjection into the forum state's affairs; 2) the burden on the defendant; 3) conflicts with the sovereignty of defendant's state/nation; 4) the forum's interest in adjudicating the dispute; 5) the most efficient judicial resolution of the dispute; 6) the plaintiff's interest in convenient and effective relief; and, 7) the existence of an alternative forum. *Sinatra v. National Enquirer, Inc.*, 854 F.2d 1191, 1198–99 (9th Cir.1988).

### 1) Purposeful Interjection

The factor of purposeful interjection is satisfied by a finding of purposeful availment, discussed *supra*. *See Roth v. Garcia Marquez*, 942 F.2d 617, 623 (9th Cir. 1991); *Sinatra*, 854 F.2d at 1199; *Haisten v. Grass Valley Medical Reimbursement Fund, Ltd.*, 784 F.2d 1392, 1401 (9th Cir. 1986).

2) Burden on the Defendant

■ The Court is sensitive to the considerable burden placed on a defendant forced to litigate in a foreign country under foreign law. *See, e.g., Asahi Metal Industry Co. v. Superior Court of California,* 480 U.S. 102, 114, 107 S.Ct. 1026, 94 L.Ed.2d 92 (1987). However, "modern advances in communications and transportation have significantly reduced the burden of litigating in a foreign country." *Sinatra,* 854 F.2d at 1199; *see also Sher v. Johnson,* 911 F.2d at 1365. Moreover, this factor is less salient where the defendant speaks English and has traveled to the forum on business related to the instant action. *See Dole Food Co. v. Watts,* 303 F.3d 1104, 1115 (9th Cir.2002).

Sharman's principal, employees and representatives speak English, and have shown considerable facility interacting with this forum. As discussed *supra,* Sharman has engaged in extensive contacts with the forum, including the retention of public relations representatives and law firms for purposes other than this jurisdictional challenge, negotiations in California of at least one contract, commercial relationships with California companies, and the assumption of contracts with California forum and choice of law provisions. The burden of litigating in this forum is thus not so great as to "overcome [the] clear justifications for the exercise of jurisdiction." *Caruth v. International Psychoanalytical Ass'n,* 59 F.3d 126, 128–29 (9th Cir.1995).

3) Conflicts with Law and Sovereignty of Foreign State

■ The Supreme Court has indicated that courts should be cautious in extending "long-arm" jurisdictional statutes in the international context. " 'Great care and reserve should be exercised when extending our notions of personal jurisdiction into the international field.' " *Asahi Metal Industry Co.,* 480 U.S. at 115, 107 S.Ct. 1026 (quoting *United States v. First National City Bank,* 379 U.S. 378, 404, 85 S.Ct. 528, 13 L.Ed.2d 365 (1965)). However, "this factor is not dispositive because, if given controlling weight, it would always prevent suit against a foreign national in a United States court." *Haisten,* 784 F.2d at 1401–02 (quotation omitted). Further, it weighs less heavily where, as here, the defendant engages in significant contact with the forum state. *See Sinatra,* 854 F.2d at 1199 (defendant maintained an agent in California, advertised heavily there, and considered California a top source of American clients).

4) Forum State's Interest in Adjudicating the Dispute

California has an interest in providing effective judicial redress for its citizens. *Sinatra,* 854 F.2d at 1200. This interest is particularly strong where the claim is one for tortious injury. *See, e.g., Panavision,* 141 F.3d at 1323 (trademark infringement); *Gordy v. Daily News,* 95 F.3d at 836 (defamation); *Plant Food Co Op v. Wolfkill Feed & Fertilizer Corp.,* 633 F.2d 155 (9th Cir.1980) (breach of warranty). Because the claims in this case implicate widespread, pervasive infringement of copyrights owned by California residents, the state's interest is considerable.

5) Efficiency of the Forum

■ In determining the efficiency of the forum, the Court looks primarily at where the evidence and witnesses are likely to be located. *Panavision,* 141 F.3d at 1324; *Caruth,* 59 F.3d at 129; *Core–Vent Corp.,* 11 F.3d at 1489; *Sinatra,* 854 F.2d at 1200. At first blush, this factor would seem to favor a forum in Australia or Vanuatu, at least with respect to Sharman, since that is where Sharman is operated and where evidence and witnesses regarding Sharman's conduct seem most likely to be located. Plaintiffs have, however, iden-

tified a number of fact witnesses located in California and other U.S. states. (Opp. at 24.) Furthermore, discovery and other aspects of these cases proceeded for some time in this Court prior to Sharman's formation, acquisition of the Kazaa system, and addition as a Defendant. The Court is thus already immersed in this litigation and best suited to adjudicate it.

### 6) Convenient and Effective Relief for Plaintiff

While litigating in Australia or Vanuatu would undoubtedly be inconvenient for Plaintiffs, little weight has been given to this factor. *Panavision*, 141 F.3d at 1324 (citing *Ziegler*, 64 F.3d at 476). This is particularly true where, as here, Plaintiffs have considerable resources and could litigate elsewhere if necessary. However, Sharman has not demonstrated that *effective* relief—remedies for infringement of U.S. copyrights within the United States—would be available other than in a U.S. forum (*see infra*).

### 7) Existence of an Alternative Forum

██ The plaintiff bears the burden of establishing that an alternative forum is not available, though this factor is significant only if other factors weigh against an exercise of jurisdiction. *Corporate Inv. Business Brokers v. Melcher*, 824 F.2d 786, 791 (9th Cir.1987); *Pacific Atlantic Trading Co. v. M/V Main Express*, 758 F.2d 1325, 1331 (9th Cir.1985). Although Australia or Vanuatu might be alternative forums for suing Sharman, it is not clear that the non-Australian co-Defendants would be amenable to service of process in either country. Moreover, these are suits under U.S. law for copyright infringement within the United States. Thus, even if a foreign court were available to hear this litigation, it would be forced to interpret U.S. law. "This fact alone militates heavily in favor of this Court's assertion of

jurisdiction." *Batzel v. Smith*, 2001 WL 1893843, at *4 (C.D. Cal. June 6, 2001).

In sum, Sharman has not made a "compelling case" that the otherwise appropriate exercise of jurisdiction is unreasonable in these circumstances. Thus, specific jurisdiction over Sharman is consistent with constitutional due process.

### 4) *Nationwide Aggregation*

██ Finally, the Court notes that even if jurisdiction over Sharman were unavailable in California state courts, it would nonetheless be appropriate in this Court on the basis of Sharman's aggregated U.S. contacts. Rule 4(k)(2) of the Federal Rules of Civil Procedure permits nationwide aggregation for cases arising under federal law, unless 1) the defendant is subject to jurisdiction of the courts of general jurisdiction of any state, or 2) aggregation is expressly forbidden by the relevant law. *See* Fed.R.Civ.P. Rule 4(k)(2); *Quokka Sports, Inc. v. Cup Int'l Ltd.*, 99 F.Supp.2d 1105, 1110–11 (N.D.Cal.1999).

Although Fifth Amendment due process governs the constitutionality of jurisdiction under Rule 4(k)(2), the Fourteenth Amendment's protections are analogous, and the same "minimum contacts" analysis is applied. *See, e.g., Central States, Southeast & Southwest Areas Pension Fund v. Reimer Express*, 230 F.3d 934, 946 n. 10 (7th Cir.2000); *Aerogroup Int'l v. Marlboro Footworks*, 956 F.Supp. 427, 439 (S.D.N.Y.1996) (collecting cases). The effect of the Rule in cases such as this is that jurisdiction may be exercised over copyright claims against a foreign defendant where sufficient contacts with, or injury to, U.S. residents is alleged, even though there are not sufficient contacts with any single state to justify jurisdiction in that state. *See* Jane C. Ginsburg, *Copyright Without Borders? Choice of Forum and Choice of Law for Copyright Infringe-*

*ment in Cyberspace,* 15 Cardozo Arts & Ent. LJ 153, 161–65 (1997).

The analysis set forth *supra* applies even more forcefully when Sharman's nationwide contacts are considered. First, Sharman's commercial availment of and contact with the U.S. forum is manifestly and geometrically greater than that of and with the California forum. Second, Sharman's distribution of its software to U.S. residents is a but for cause of all of the infringement alleged in this case, even if use by California residents is a but for cause of only a portion of that injury. Additionally, to the extent that the injuries alleged in these cases did not foreseeably accrue to California residents, there is little doubt that Sharman knows or should know that the vicarious or contributory infringement of media copyrighted by U.S. persons under U.S. law is likely to injure U.S. residents.

In sum, even if Sharman could not reasonably anticipate being haled into a court in this *state,* it certainly could reasonably anticipate being haled into a court in this *country.* Thus, jurisdiction could be exercised constitutionally in this Court pursuant to Rule 4(k)(2) even if it could not be so exercised by California state courts.

### B. *Venue*

 Sharman also moves for dismissal for improper venue. If personal jurisdiction in a copyright case may be exercised over a corporation in a district, then venue also is proper in that district. 28 U.S.C. § 1400; *Colt Studio, Inc. v. Badpuppy Enter.,* 75 F.Supp.2d 1104, 1112 (C.D.Cal. 1999). Because the Court concludes that jurisdiction is proper in this district, venue is proper as well.

### C. *Forum Non Coveniens*

 Sharman additionally moves for dismissal on the grounds of forum non coveniens. The plaintiff's chosen forum "should rarely be disturbed" unless the balance of interests "is strongly in favor of the defendant." *Gulf Oil Corp. v. Gilbert,* 330 U.S. 501, 508, 67 S.Ct. 839, 91 L.Ed. 1055 (1947). Key in this analysis is the availability of an alternative forum where *all* defendants are amenable to personal jurisdiction. *Watson v. Merrell Dow Pharmaceuticals,* 769 F.2d 354, 357 (6th Cir.1985); *In re Air Crash Disaster Near New Orleans, La. on July 9, 1982,* 821 F.2d 1147, 1168–69 (5th Cir.1987). Sharman has made no showing that its non-Australian co-Defendants are amenable to suit in Australia or Vanuatu. Moreover, while it is irrelevant that an alternative forum's law may be *unfavorable* to Plaintiffs' claims, the subject matter of the dispute must at least be actionable there. *See Piper Aircraft Co. v. Reyno,* 454 U.S. 235, 252–54, 102 S.Ct. 252, 70 L.Ed.2d 419 (1981). Sharman has failed to demonstrate that a derivative action arising from copyright infringement·by Sharman's U.S. users—to which these suits are limited—would be available in either Australia or Vanuatu.

Nor has Sharman shown that the balance of private and public interest factors favors dismissal. *See Lockman Foundation v. Evangelical Alliance Mission,* 930 F.2d 764, 767 (9th Cir.1991). Thus, Sharman has failed to "overcome the great deference ... due plaintiffs" in their choice of forum. *Ceramic Corp. of Am. v. Inka Maritime Corp.,* 1 F.3d 947, 949 (9th Cir.1993) (quotations omitted).

### D. *Political Question Doctrine*

 Sharman also argues that the Complaint should be dismissed pursuant to the political question doctrine. Under that doctrine, a court should not rule on a case if the issues to be litigated are best resolved by the political process.

In the seminal case of *Baker v. Carr*, 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962), the Supreme Court explained:

> Prominent on the surface of any case held to involve a political question is found a textually demonstrable commitment of the issue to a coordinate political department; or a lack of judicially discoverable and manageable standards for resolving it; or the impossibility of deciding without an initial policy determination of a kind clearly for nonjudicial discretion; or the impossibility of a court's undertaking independent resolution without expressing lack of respect due coordinate branches of government; or an unusual need for unquestioning adherence to a political decision already made; or the potentiality of embarrassment from multifarious pronouncements by various departments on one question.

*Id.* at 217, 82 S.Ct. 691.

The areas where the doctrine principally has been applied are: 1) the Republican Form of Government Clause and the electoral process; 2) foreign affairs; 3) Congress's ability to regulate its internal processes; 4) the process for ratifying constitutional amendments; 5) instances where the federal court cannot shape effective equitable relief; and 6) the impeachment process. *See generally* Erwin Chemerinsky, Federal Jurisdiction, at 142–66 (2d ed.1994).

Sharman seems to argue that a confluence of factors justify invocation of the doctrine, from the international implications of the relief sought, to the judge-made nature of the copyright theories alleged, to the First Amendment protections potentially applicable to the source code at issue in this case. None of these concerns constitute the types of factors sufficient to divest the Court of jurisdiction under the political question doctrine. Rather, most relate to the ability of the Court to grant the relief sought by Plaintiffs, and not to the Court's jurisdiction to hear the case. Consideration of these concerns, particularly those relating to international comity, are appropriate if at all in determining the scope of any relief, should liability be established.

Sharman also seems to argue that the Court should abstain from hearing these cases in light of ongoing congressional evaluation of the technologies implicated. Sharman cites *Sony v. Universal Studios, Inc.*, 464 U.S. 417, 104 S.Ct. 774, 78 L.Ed.2d 574 (1984):

> The judiciary's reluctance to expand the protections afforded by the copyright without explicit legislative guidance is a recurring theme. [Citations.] Sound policy, as well as history, supports our consistent deference to Congress when major technological innovations alter the market for copyrighted materials. Congress has the constitutional authority and the institutional ability to accommodate fully the raised permutations of competing interests that are inevitably implicated by such new technology.
>
> In a case like this, in which Congress has not plainly marked our course, we must be circumspect in construing the scope of rights created by a legislative enactment which never calculated such a calculus of interests.

464 U.S. at 431, 104 S.Ct. 774 (citations omitted).

Indeed, if and when this Court reaches the merits of the claims against Defendants, it will be obligated to bear in mind these and other invocations of the Supreme Court. But the quoted language relates to statutory construction, not to jurisdiction. Nothing in *Sony* suggests that this Court should refuse to hear the instant cases merely because they present novel or dynamic questions of law. The Court cannot abstain from adjudicating actions properly before it based upon mere

speculation or hope that greater legislative guidance may one day be afforded.

### E. *Sharman's Extraterritorial Activities*

Sharman also contends that the Court does not have subject matter jurisdiction over the case because Sharman's allegedly wrongful conduct purportedly takes place entirely outside the United States, and because U.S. law cannot be applied extraterritorially unless Congress so authorizes. *See EEOC v. Arabian Am. Oil Co.,* 499 U.S. 244, 248, 111 S.Ct. 1227, 113 L.Ed.2d 274 (1991).

While Sharman argues that its alleged wrongful acts are not covered by the Copyright Act, the very case cited for this proposition holds otherwise. *See Armstrong v. Virgin Records, Ltd.,* 91 F.Supp.2d 628, 635–36 (S.D.N.Y.2000). *Armstrong* is a case in which, in Sharman's own words, the court held that "United States courts can exercise subject matter jurisdiction under the Copyright Act over foreign defendants whose extraterritorial acts aid, induce or contribute to copyright infringement by another within the United States." (Sharman Mot. at 8.) *See also ITSI T.V. Prods., Inc. v. California Auth. of Racing Fairs,* 785 F.Supp. 854, 864 (E.D.Cal.1992) ("To satisfy the jurisdictional requirement that the defendant commit an act of infringement in the United States, the plaintiff must show only that the direct act of infringement for which defendant is contributorily or vicariously liable occurred in the United States."), *rev'd in part on other grounds,* 3 F.3d 1289 (9th Cir.1993). This is precisely what is alleged here.

## IV. LEF'S MOTION TO DISMISS

### A. *The Parties' Arguments*

Defendant LEF Interactive PTY, Ltd. ("LEF") moves to dismiss for lack of personal jurisdiction only. LEF contends that it is "a management company that merely provides services to other businesses, one of whom is [Sharman]." (Memo of P & A in Support of LEF's Mot. to Dismiss ("LEF Mot."), at 1.) LEF argues that it does not own or operate the Kazaa system or have any other relationship with the conduct charged in these actions. (*Id.*) Rather, LEF asserts, it is an Australian business with no connection to this case, and no other contacts with the United States or California. (*Id.*) Naming LEF as a Defendant, it adds, "makes no more sense than naming Sharman's accountants." (*Id.*)

Plaintiffs assert, in contrast, that LEF and Sharman are virtually coterminous. For instance, they were formed at the same time, February 2002, by the same principal and owner, Nicola Hemming. Every LEF employee has only Sharman as a paying client, and all of LEF's revenue comes from Sharman. (Pls.' Opp. to LEF's Mot. ("Opp."), at 11.) Plaintiffs add that LEF has interchangeably referred to itself as Sharman or LEF, that LEF's employees are or were listed on the Kazaa.com website as members of "the Sharman team," that LEF's office door and letterhead bear the Kazaa logo, and that there is no independent LEF e-mail address—employees receive e-mail at "sharmannetworks.com." (*Id.*) Finally, until recently, Sharman and LEF shared the same phone number, and LEF answered the phone "Sharman Networks." (*Id.*) In short, Plaintiffs claim, LEF was formed for the sole purpose of operating nearly every aspect of Sharman's business. (*Id.* at 10.)

Therefore, Plaintiffs argue that LEF and Sharman are corporate alter egos, and thus that personal jurisdiction over Sharman may be imputed to LEF. (*See* Opp. at 21.) Indeed, LEF's counsel conceded at hearing on this Motion that employees of

LEF do conduct much of Sharman's business. LEF maintains that management relationships such as this are common in Australia, however, and that they do not automatically render the management company amenable to suit in any jurisdiction into which the client corporation may be haled. Rather, LEF contends, jurisdiction does not exist because LEF does not independently have sufficient "minimum contacts" with the forum.

### B. *Analysis*

#### 1. *Corporate Alter Ego*

 Plaintiffs posit the jurisdictional inquiry as a question of corporate alter ego. Under the alter ego doctrine, one corporation may be liable for the actions of another where it is shown that " '(1) there is such unity of interest and ownership that the separate personalities of [the corporations] no longer exist and (2) that failure to disregard [their separate identities] would result in fraud or injustice.' " *AT & T v. Compagnie Bruxelles Lambert*, 94 F.3d 586, 591 (9th Cir.1996) (quoting *Watson v. Commonwealth Ins. Co.*, 8 Cal.2d 61, 63 P.2d 295, 298 (Cal.1936)). Where a parent company is the corporate alter ego of a subsidiary, the forum contacts of the subsidiary may be imputed to the parent for purposes of establishing personal jurisdiction. *See, e.g., Doe v. Unocal Corp.*, 248 F.3d 915, 926 (9th Cir. 2001); *AT & T*, 94 F.3d at 591.

Plaintiffs assert and the Court agrees that there is a clear unity of interest between Sharman and LEF.

The second prong of the alter-ego analysis, whether disregarding the companies' separate identities would result in fraud or injustice, often looks to whether corporate formalities are ignored, or to whether one company is undercapitalized in an attempt to shield the alter ego from financial liability. *See, e.g., Firstmark Capital Corp. v. Hempel Financial Corp.*, 859 F.2d 92, 93 (9th Cir.1988); *Flynt Distributing Co. v. Harvey*, 734 F.2d 1389, 1393–94 (9th Cir. 1984). Here, Plaintiffs have not alleged that Sharman is undercapitalized, or that corporate formalities have been ignored, or that any other fraud has occurred between the two companies. Rather, Plaintiffs make two claims. First, they argue that a failure to exercise jurisdiction over LEF would insulate Sharman's de facto staff from the Court's discovery jurisdiction. (*See* Opp. at 22.) Thus, they assert, Sharman could simply characterize its "employees"—who technically work for LEF—as foreign third parties from whom evidence cannot be taken. (*Id.*) Second, Plaintiffs contended at hearing on this Motion that full recovery for the alleged infringement of their copyrights would be hindered if LEF and its assets were not subject to this Court's jurisdiction.

The Court is skeptical that either of these claims constitutes the type of "fraud or injustice" typically considered sufficient to justify ignoring corporate distinctions. The Court concludes, however, that Plaintiffs employ the wrong standard.

#### 2. *Minimum Contacts*

Many courts conflate the requirements of due process and alter ego liability. However, the "minimum contacts" approach of *International Shoe* clearly has supplanted the mechanical, formalistic approach of cases like *Cannon Mfg. Co. v. Cudahy Packing Co.*, 267 U.S. 333, 334, 45 S.Ct. 250, 69 L.Ed. 634 (1925) (no jurisdiction where absent parent, and subsidiary present in forum, observe corporate formalities, despite fact that parent dominates subsidiary "immediately and completely"). *See In re Teletronics Pacing Systems, Inc., Accufix Atrial "J" Leads Products Liability Litigation*, 953 F.Supp. 909, 914–18 (S.D.Ohio 1997) (expanding on the evolution away from these mechanical

concepts and the abandonment of corporate alter ego as the relevant jurisdictional inquiry), *rev'd on other grounds* 221 F.3d 870 (6th Cir.2000). As the Sixth Circuit in *Velandra v. Regie Nationale des Usines Renault* observed:

> The law relating to the fictions of agency and of separate corporate entity was developed for purposes other than determining amenability to personal jurisdiction, and the law of such amenability is merely confused by reference to these inapposite matters.

> The International Shoe decision represented an effort by the Supreme Court to clarify earlier concepts in the areas of the amenability of foreign corporations to the personal jurisdiction of state courts by sweeping aside any lingering notions that the earlier shibboleths of "consent," "presence," and "doing business" were self-defining abstractions, and by redefining those tests in terms of "minimum contacts."

336 F.2d 292, 297 (6th Cir.1964), *cited in In re Telectronics Pacing Systems, Inc.,* 953 F.Supp. at 915; *see generally* Lea Brilmayer and Kathleen Paisley, *Personal Jurisdiction and Substantive Legal Relations: Corporations, Conspiracies and Agency,* 74 Cal. L.Rev. 1 (1986).

Similarly, in *Wells Fargo & Co. v. Wells Fargo Express Co.,* the Ninth Circuit reversed a district court's denial of personal jurisdiction over a nonresident corporation, which the court had predicated on *Cannon,* 556 F.2d 406 (9th Cir.1977). The circuit court sent the case back to the district court to consider whether forum contacts other than those considered under *Cannon* were sufficient to establish jurisdiction. *Id.* at 426. Among other contacts, the Ninth Circuit noted plaintiffs' theory that the in-state subsidiary may have acted as the agent of the out-of-state parent, conducting its forum activities "at the behest, and under the control" of the

latter. *Id.* at 419. The *Wells Fargo* court concluded that all of defendant's contacts, including and in addition to those constituting a possible corporate alter ego relationship, should be considered in the jurisdictional inquiry. *Id.* at 419–20.

Thus, the controlling question remains whether the defendant has such minimum contacts with the forum state that it should reasonably anticipate being haled into court there. In the parent-subsidiary context, several courts have articulated this as a requirement that plaintiff show either "(1) *attribution,* 'that the absent parent instigated the subsidiary's local activity;' or (2) *merger,* 'that the absent parent and the subsidiary are in fact a single legal entity.'" *Third National Bank v. WEDGE Group,* 882 F.2d 1087, 1092, 1094 (6th Cir.1989) (Keith, J., concurring) (quoting Brilmayer & Paisley, *supra* ); *In re Telectronics Pacing Systems, Inc.,* 953 F.Supp. at 918–19 (collecting cases employing similar standards).

"The attribution test implies that the in-forum subsidiary is acting on behalf of the absent parent. Thus, the Court attributes the subsidiary's contacts to the parent because the parent 'purposefully avails' itself of doing business in the forum by accessing the market through a subsidiary." *In re Telectronics Pacing Systems, Inc.,* 953 F.Supp. at 919; *see Wells Fargo & Co.,* 556 F.2d at 419.

> Under the merger theory of jurisdiction, the two entities are so closely aligned that it is reasonable for the parent to anticipate being "haled" into court in the forum because of its relationship with its subsidiary. Some factors that might indicate a sufficient relationship with the subsidiary to justify jurisdiction include overlap in board of directors and officers, interchange of personnel between the parent and the corporation, exchange of documents and records be-

tween parent and subsidiary, listing subsidiary as a branch, agency, or division of the parent, or indicating that subsidiary and parent are part of the same entity ...

*In re Telectronics Pacing Systems, Inc.,* 953 F.Supp. at 919.

### 3. *Application to LEF*

 Despite the relatively novel corporate affiliation at issue in the instant actions, the relationship between Sharman and LEF includes the indicia of both attribution and merger. First, attribution is satisfied by Plaintiffs' showing that Sharman's activities are predominantly instigated or maintained by employees of LEF. Second, the extensive overlap of corporate operation and perception, described above, shows a tremendous degree of "merger" between the two companies. As set forth above, Sharman has sufficient contacts with California to subject it to jurisdiction here. LEF's actions through and with Sharman similarly subject it to jurisdiction in this Court. Thus, whether or not these facts establish corporate alter ego for purposes of liability, they satisfy the due process jurisdictional inquiry.

## V. CONCLUSION

Therefore, the Court hereby DENIES Defendant Sharman Network Ltd.'s Motion to Dismiss the First Amended Complaint for Lack of Subject Matter Jurisdiction and Other Grounds, and DENIES Defendant LEF Interactive's Motion to Dismiss for Lack of Personal Jurisdiction.

IT IS SO ORDERED.